Juan **INOSENCIO, et al., Plaintiffs,**

v.

Perry **JOHNSON, et al., Defendants.**

Civ. A. No. 77-70377.

United States District Court,
E. D. Michigan, S. D.

Sept. 15, 1982.

John Eshleman Wahl, San Francisco, Cal., for plaintiffs.

Elaine Dierwa Fischhoff, Asst. Atty. Gen., State of Mich., Detroit, Mich., for defendants.

## OPINION AND FINAL JUDGMENT

FEIKENS, Chief Judge.

Plaintiffs are two groups united by their desire to see the Detroit Metropolitan Community Church (the Church) conduct congregate worship services at the State Prison for Southern Michigan at Jackson (the Prison or Jackson Prison). The Church is a member of the Universal Fellowship of Metropolitan Community Churches and differs from other Protestant churches principally in not condemning homosexuality. One of its purposes is to minister to the spiritual needs of homosexual persons in and out of prison. The first group of plaintiffs is composed of a number of homosexual inmates at the Prison; the second includes the local officials of the Church and the Church itself.

Since 1976 the Prison has recognized the Church, and as a matter of policy has al-lowed its ministers to meet with inmates and mail literature into the Prison. The Prison has refused, however, to allow ministers of the Church to conduct congregate worship services; it does allow ministers of other congregations to do this. Plaintiffs filed their original complaint in February of 1977 [1] alleging that the Prison's decision to prohibit worship services violated the inmates' First Amendment right to the equal protection of the law. On behalf of the Church, the complaint also alleged that the Prison, contrary to its policy, treated the Church's ministers differently from ministers of other faiths by intercepting mail, harassing them, and not admitting them for visits as clergy.

After considering the motions of both sides for summary judgment and reading the many affidavits submitted by both sides, I found that the Prison had acted with sufficient reason in prohibiting group services, and I granted summary judgment to defendants on that issue. Because the Prison agreed to abide by its policy concerning the ministers, the claims of the Church were left to be settled and the final order gave judgment on all issues to defendants.

Plaintiffs appealed that decision and the United States Court of Appeals for the Sixth Circuit reversed and remanded to give plaintiffs "an opportunity to present evidence concerning the effect of the Church's congregational services in prison and on the treatment of the Church's ministers in prison." *Inosencio, et al. v. Johnson, et al.*, 658 F.2d 418 (6th Cir. 1981).

The parties have again settled the claims of the Church concerning unequal treatment.[2] They have also taken advantage of

---

**1.** Plaintiffs later filed an amended complaint changing only the names of defendants who had been replaced in the Michigan Department of Corrections by defendants currently named. At least one of the named defendants, Barry Mintzes, has recently left the Department. Even though plaintiffs have not amended the complaint to reflect most recent changes, the final order accompanying this opinion will be addressed to whomever currently holds the appropriate positions of authority at the Prison.

**2.** The role of the Church in this litigation is not altogether clear. In most paragraphs of the complaint the term "plaintiffs" appears to refer only to the inmates. The Church does not seem to allege that its First Amendment rights are violated by the prohibition on services or that it has been denied the equal protection of the law in that regard. In any case it would appear plain that the Church and its ministers have no First Amendment right to preach in a non-public place such as a prison. *Greer v. Spock,* 424 U.S. 828, 838, 96 S.Ct. 1211, 1217,

the Circuit Court's remand and have presented considerable testimony for and against congregate worship at the Prison. After carefully considering the testimony of plaintiffs' witnesses on the effect of similar services in the California prisons and the testimony of Michigan prison officials, I again find that the Prison has acted reasonably and that defendants are, therefore, again entitled to judgment.

The facts of this case are very similar to those in a case the Supreme Court reviewed in 1977, *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). I will briefly review the findings in that case since it and the few cases following it articulate the applicable law in this case. In *Jones,* the North Carolina Department of Corrections prohibited a prisoners' union from meeting and distributing literature in bulk mailings. The union in that case, like the prisoners here, alleged that the decision infringed First Amendment rights, free speech and free association. Because the Prison allowed other groups to meet, the union also alleged that the decision deprived them of the equal protection of the laws guaranteed by the Fourteenth Amendment. The Corrections Department justified the prohibition arguing that "the existence of the Union will increase the burdens of administration and constitute a threat of essential discipline and control. They [the department officials] are apprehensive that inmates may use the Unions to establish a power bloc within the inmate population which could be utilized to cause work slow-

downs or stoppages or other undesirable concerted activity." *Id.,* at 123, 97 S.Ct. at 2537 (quoting the opinion of the district court, 409 F.Supp., 937 at 941).

The district court acknowledged the sincerity of the department's fears, but found the experts divided on the effect of a union and that there was "not one scintilla of evidence to suggest that the Union has been utilized to disrupt the operation of the penal institution." *Id.* at 124, 97 S.Ct. at 2537. Finding that the Department had not established that the activity was detrimental to proper penological objections, the district court gave judgment to the union.

The Supreme Court rejected this analysis and reversed. Quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948), the Court reemphasized generally that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Jones,* 433 U.S. at 125, 97 S.Ct. at 2537. It then addressed specifically the perspective a district court must adopt in reviewing allegations of constitutional violations by prisoners:

> Without a showing that [the motivating beliefs of the Corrections Department] were unreasonable, it was error for the District Court to conclude that [the Department] needed to show more. In particular, the burden was not on appellants to show affirmatively that the Union

---

47 L.Ed.2d 505 (1976); *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 134, 97 S.Ct. 2532, 2542, 53 L.Ed.2d 629 (1976) (quoting *Greer*).

Furthermore, it is equally plain that because I find that the prisoners have not been deprived unconstitutionally of the equal protection of the law, a similar claim by the Church must also fall for the same reasons, namely, that there is a rational basis for treating the Church differently. *Jones* at 134, 97 S.Ct. at 2542 (following *City of Charlotte v. Firefighters,* 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976)).

The only grievance the Church puts forward is that its ministers are not being accorded the equal protection of the law since unlike ministers of other faiths, they are being harassed,

their literature is intercepted, and they are not always allowed to visit in their capacity as ministers. · This grievance, as the text describes, was settled between the parties and, therefore, the Church should no longer be involved in this suit. Nevertheless, it appears that it is the Church that is pursuing the litigation on behalf of the prisoners. No prisoner has ever appeared in this court, and no prisoner since 1977 has filed an affidavit or any other correspondence. Moreover, counsel for plaintiffs was obviously retained by the Church.

It is only because of the mandate of the Circuit Court that I have not inquired further into the participation of the prisoners in this suit and the standing of the Church to litigate on behalf of the prisoners.

would be "detrimental to proper penological objectives" or would constitute a "present danger to security and order." [409 F.Supp.,] at 944–945. Rather, "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417 U.S., [817] at 827 [94 S.Ct. 2800, 2806, 41 L.Ed.2d 495].

*Id.,* at 128–129, 97 S.Ct. at 2539. On the Union's first amendment claims, the Court concluded, "It is enough to say that [the Department has] not been conclusively shown to be wrong in this view." *Id.,* at 132, 97 S.Ct. at 2541. On the equal protection claims, it added, "Thus [the Department officials] need only demonstrate a rational basis for their distinctions between organizational groups." *Id.,* at 134, 97 S.Ct. at 2542.

*Jones* plainly places the burden on challengers; they must demonstrate that the justification offered by prison officials is wholly lacking in reason.

*Jones* was followed by *Bell v. Wolfish,* 441 U.S. 520, 529, 99 S.Ct. 1861, 1869, 60 L.Ed.2d 447 (1979), which reversed a district court decision ordering multifold changes in the way federal authorities operated the New York Metropolitan Correctional Center. Again the court emphasized that the challengers had "not met their heavy burden of showing that these officials have exaggerated their response to the genuine security considerations that actuated these restrictions and practices." *Id.,* at 562, 99 S.Ct. at 1886. The Court quoted and followed the principles discussed in *Jones.*

Since *Bell,* the U.S. Court of Appeals for the Sixth Circuit has twice applied the principles of *Jones* and *Bell* in cases involving the exercise of religion within prisons. First, in dicta, in *Jihaad v. O'Brien,* 645 F.2d 556 (6th Cir. 1981), the court said, "It is settled that a prisoner does not have an absolute right to practice his religion in accord with his desires. The needs of the institution and penological objectives must be balanced against the right of the individual prisoner." Citing *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) and *Jones.* In *Jihaad* the prisoner was seeking damages for discipline he suffered after refusing to shave a beard required by his Sunni Muslim faith.

The second case, *Weaver v. Jago,* 675 F.2d 116 (6th Cir. 1982), struck a cautioning note against too much deference and emphasized what appears at least in the background of the Supreme Court's discussions: even though deference is accorded the Prison, the court must still find that the rules further security and are not an exaggerated response. In *Weaver* the prison had disciplined a young Cherokee Indian for refusing to cut a braid he claimed had religious significance. The prison had done no more than state that the rule furthered security and good order; it had not explained the connection.

In this case the Prison fears that allowing worship services could exacerbate the already acute problem of homosexual violence in the Prison. Both sides have presented considerable and diverse testimony on the effect of services by a recognized homosexual church. One point that witnesses on each side agreed on, however, is that the peculiarly violent brand of homosexuality in prisons is a very dangerous problem. Ruth Rushen, the Director of the California Department of Corrections, testifying for plaintiffs on the effect of the Church's services in two California prisons, admitted that homosexuality required special consideration. She described the elaborate security measures the California prisons had adopted to isolate predatory prisoners who would take advantage of weaker men. (Tr. II. 34.) Particularly aggressive inmates are transferred to the Medical Facility at Vacaville where security is greater. If there they still pose a problem, the prison isolates them in management control divisions and may transfer them to the maximum security prisons at San Quentin and Folsom. (Tr.

II. 25–33.) She candidly offered that without the federal district court's order in *Lipp v. Procunier,* 402 F.Supp. 623 (N.D.Calif. 1975), the California Department of Corrections probably would not have allowed the Church to conduct congregate services. (Tr. II. 37–38.)

The Regional Administrator and Warden of Jackson, Dr. Barry Mintzes, and the Superintendent of the Reception and Diagnostic Center at Jackson, Dr. John Prelesnik, were far more graphic in their descriptions of the problem. Both men are trained psychologists with years of experience in treating prisoners and in prison administration. Dr. Mintzes has served almost a dozen years with the Department of Corrections in Michigan, much of that time either as the chief psychologist at Jackson Prison or as its warden. (Tr. 193–195.) Dr. Prelesnik has worked in the Reception and Diagnostic Center for at least six years, the last five as supervisor.

The picture they draw of homosexuality in prison is in stark contrast to the life of homosexuals outside of prison. Homosexuality in prisons is more than anything else an act of violence and a display of machismo. Predatory inmates who may not even be homosexual out of prison take advantage of weaker or effeminate prisoners as a way of establishing their supremacy in the prison pecking order. (Tr. 197, 307–310, 314.) True homosexuals are in fact looked upon with disdain. (Tr. 314.) Weaker inmates, perhaps desiring affection in the hostile prison environment, may seek the protection of stronger patrons. They become the subject of love triangles, jealousies and often end up as prostitutes or the victims of rapes and even murder. During the six and one-half years before the Church requested recognition by the Prison, there had been twenty-six violent incidents at Jackson involving homosexuality, including three murders. (Tr. 140.)

Both psychologists stated that the well adjusted homosexual inmate would probably avoid the Church's services fearing that his sexual preference would only then be discovered and that he would consequently draw the attention of the more vicious, manipulative types. (Tr. 259, 310.) Instead, they testified, the services would attract the predators, the maladjusted homosexuals and prisoners not sure of their sexual identity, frightened in the hostile culture of the institution and looking for security, compassion and possibly affection. (Tr. 197, 307, 311.) Services intended to nourish the spirit would become opportunities where the weak would be identified and volatile liaisons could more easily be made.

It is precisely for these reasons that the Michigan Department of Corrections decided not to allow the Church to conduct its services. It wanted to prevent exposing homosexuals to violent predatory prisoners and eliminate an especially attractive opportunity for meetings.

Plaintiffs respond to defendants' fear of increased violence from two directions. First, they argue, homosexual prisoners who would participate in the Church's services might develop a more elevated self image and would as a result be better able to resist predators and avoid unsavory relationships. Plaintiffs presented a number of witnesses, their own ministers and the ministers of other congregations who had been involved in the Church's services in California. All testified that the prisoners who had participated, though not necessarily solely in worship, did appear to become better adjusted. Drs. Mintzes and Prelesnik admitted the possibility. (Tr. 243.)

I find Dr. Mintzes' response to the argument conclusive, however. Asked whether he did not see that a better self image might be an effective shield, he responded: "I don't believe their self image would have anything to do with dealing with this. You can have the best image in the world and five people jump you—you can have the best self image and still be just as vulnerable. . . . I would say to the extent they are able to conduct themselves in a secure fashion and not allow themselves to be identified or preyed upon, I would say, to that extent, they would be effective to the extent that homosexuals are effective now." (Tr. 243–244.)

Plaintiffs' second approach in form is stronger. They attempt to show defendants' fears groundless by presenting evidence that services conducted in similar prisons in California did not produce the predicted increase in violence. Following entry of a negotiated agreement in 1976, *Lipp v. Procunier,* 402 F.Supp. 623 (N.D. Calif.1975), the California Department of Corrections allowed the Church to conduct worship services at two of its facilities: the California Mens' Colony at San Luis Obispo, and the California Medical Facility at Vacaville. Both facilities are medium security. Plaintiffs called Ruth Rushen, the Director of the California Department of Corrections. She testified that, "The Church is operating very well. There have been no incidents of violence or there haven't been any incidents of pressuring or anything like that. The Church is going along like all the other Churches." (Tr. II. 8.)

Though this response might be effective to rebut the fears of some prisons, I find in this case that it fails because of the wide differences between Jackson Prison and the California prisons, both in their physical arrangement and in the way they are run. The two California prisons are designed in much the same way: housing units of three floors each connect to a single main hall. The housing units contain approximately 100 cells over the three floors and approximately 100 inmates live in each unit. (Tr. II. 9–11.)

Jackson Prison, on the other hand, has cell blocks with five open, tiered galleries. The north complex houses seven hundred men, the central three thousand, and the south one thousand five hundred.[3] Obviously, security is more easily maintained in the California units where fewer inmates occupy separate floors and the cells themselves are more easily guarded. Asked which prisons in California most resembled Jackson's configuration, Ms. Rushen said Folsom and San Quentin, the two maximum security prisons for which, she testified, the Department could make a good case for not

allowing services. (Tr. II. 39.) She did say that all political considerations aside, she personally would be willing to allow services even at those prisons. Her other testimony casts serious doubt on the soundness of that judgment, however. Ms. Rushen repeated a number of times that services did not cause problems where they are held only because predatory inmates were constantly being removed and isolated in more secure places, ultimately to Folsom and San Quentin. The preconditions for safe services at Vacaville and San Luis Obispo thus do not exist at San Quentin and Folsom.

California's rigorous program of isolation is the second way in which that system differs from Jackson Prison. In California, predatory inmates cannot cause serious problems because as soon as they are exposed, they are transferred to increasingly more secure prisons. Troublemakers at the Men's Colony are transferred first to an isolated management control wing, from there to the Medical Facility, and finally to Folsom or San Quentin. Ms. Rushen, as I have indicated, attributed the safe introduction of services to this program. (Tr. II. 35–36.)

Dr. Mintzes testified that the design of the Prison, particularly its large cell blocks, make close supervision difficult even in the medium security complexes. The central close security complex would, of course, be the final location for the violent inmates in any case and would, therefore, be as uncontrollable as Folsom or San Quentin.

In conclusion, I do not find that the Michigan Department of Corrections acted unreasonably or overreacted when it prohibited congregate worship services by the Metropolitan Community Church. All agreed that homosexuality in prisons is a serious problem, being primarily a vehicle for the display of machismo and a tool in the inmate power structure. Nor can anyone deny that persons attending services would most likely be exposing themselves as homosexuals and, therefore, possible victims of aggression. Plaintiffs have not rebutted

---

**3.** There is a fourth complex, the Reception and Diagnostic Center, which houses only temporarily about 450 prisoners. No congregation conducts services in this complex.

**136**

this prediction, one I add that must be granted great deference. The experience in California, because of the differences in the institutions, does not provide a sound test of the effect of services at Jackson. In addition, plaintiffs' speculation that a better self image might protect one from aggression is out of touch with the hostile reality of prison life.

Judgment must, therefore, go to defendants. An appropriate order follows.