Kenneth L. BROWN, Plaintiff,

Juan Inosencio, et al.,
Plaintiffs-Appellants,

v.

Perry JOHNSON and Charles E. Egeler,
Defendants-Appellees,

No. 82–1768.

United States Court of Appeals,
Sixth Circuit.

Argued April 10, 1984.
Decided Sept. 11, 1984.

award was nevertheless inappropriate for the     aforesaid reasons.

John Eshleman Wahl, argued, San Francisco, Cal., David Piontkowsky, Susan Winshall & Associates, Southfield, Mich., for plaintiffs-appellants.

Frank J. Kelley, Atty. Gen. of Mich., David G. Edick, argued, Lansing, Mich., for defendants-appellees.

Before ENGEL and MARTIN, Circuit Judges, and WEICK, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

The issue presented here is whether state prison officials may prohibit inmates affiliated with the Universal Fellowship of Metropolitan Community Churches, a Christian church which has a special ministry to the spiritual and religious needs of homosexuals, from participating in group worship services within the prison, while permitting other churches to hold such worship services.

Plaintiffs, state prisoners, the Detroit Metropolitan Community Church and certain Church officials, appeal a decision of the district court finding that the defendants, prison officials at the Jackson State Prison for Southern Michigan, did not act unreasonably or overreact when it prohibited congregate worship services by the Church at the prison. *See Inosencio v. Johnson*, 547 F.Supp. 130 (E.D.Mich.1982).

Prison officials recognized the Church as a bona fide religion in 1976. Following this recognition prison officials have allowed the Church's ministers to meet with inmates on an individual basis and to mail religious literature to them. Church officials have not, however, been permitted to conduct congregate worship services within the prison. Plaintiffs began this action in February 1977. They challenged the blanket prohibition against congregate worship services within the prison by the Church. The Church is a member of the Universal

Fellowship of Metropolitan Community Church and differs from other Protestant churches principally in not condemning homosexuality. One of its purposes is to minister to the spiritual needs of homosexual persons in and out of prison; the Church, however, does not encourage homosexual behavior.

The plaintiffs initially argued that the prison's blanket prohibition against congregate worship services by the Church violated the first amendment because inmates of other faiths and their respective churches, which were not supportive of the spiritual needs of homosexual inmates, were permitted to conduct congregate worship services, while the plaintiffs were not. This claim was rejected by the district court.

After an appeal to this court, we remanded the district court's summary judgment order to allow plaintiffs "an opportunity to present evidence concerning the effect of the Church's congregational services in prison and on the treatment of the Church's ministers in prison." *Inosencio v. Johnson*, 658 F.2d 418, 419 (6th Cir. 1981). Following the presentation of additional testimony, the district court again found for the defendants. This appeal followed.

■ Here, plaintiffs assert that the prison's blanket prohibition against the Church's holding congregate worship services violates their first amendment right to religious freedom. They also argue they were denied equal protection of the law because other inmates and churches were permitted to hold group worship services, while they were denied the same privilege. In considering these claims our starting point must be *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 497 (1979). In *Bell* the Court articulated four principles to consider when a challenged prison rule or regulation is attacked on constitutional grounds. First, it is clear that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Id.* at 545, 99 S.Ct. at 1877. *See also Wolfel v. Bates*, 707 F.2d 932, 934 (6th Cir.1983) (per cu-

riam) (prison administrators do not have "an overriding interest in the *indiscriminate* suppression of peacefully communicated inmate complaints") (emphasis in original). A prisoner retains those rights that are "not inconsistent with his status as a prisoner or with the legitimate penalogical objectives of the corrections system." *See Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Second, merely because prisoners "retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations.... There must be a 'mutual accommodation' between institutional needs and objectives and the provisions of the Constitution that are of general application." *Bell*, 441 U.S. at 546, 99 S.Ct. at 1878 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974)). *See also Meadows v. Hopkins*, 713 F.2d 206, 209–210 (6th Cir.1983) (prison regulations infringing on inmates constitutional rights must be evaluated in light of the central objectives of prison administrators). Third, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights" of convicted prisoners. *Bell*, 441 U.S. at 546, 99 S.Ct. at 1878. And finally, because the daily operation of a correctional facility poses difficult and unique management problems, prison officials should be accorded substantial deference in the adoption and implementation of policies and practices that in "their judgment are needed to preserve internal order and discipline and to maintain institutional security. 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" *Bell* at 547–48, 99 S.Ct. at 1878 (quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)). Applying these principles, in *Bell* the Court found

that a prison's prohibition against inmate receipt of hardback books not mailed directly from publishers did not violate the inmates' first amendment rights because the prohibition was a rational response to an obvious security problem, the rule was executed in a neutral fashion, and there were alternative means available for inmates to obtain reading material. *Bell*, 441 U.S. at 550–52, 99 S.Ct. at 1880–81.

Similarly, in *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), the Court held that neither the first amendment nor the equal protection clause were impermissibly infringed when state prison officials prohibited a prisoners' union from soliciting other inmates to join the union, barred all meetings of the union, and refused to deliver packets of union publications that had been mailed in bulk to several inmates for redistribution among other prisoners, even though similar privileges were extended to other organizations within the prison. Addressing the union's first amendment associational claims, the *Jones* Court noted that first amendment rights "may be curtailed whenever the institution's officials in the exercise of their informed discretion, reasonably conclude that such associations, whether through group meetings or otherwise, possess the *likelihood of disruption* to prison order or stability, or otherwise interfere with the legitimate penalogical objectives of the prison environment." *Jones*, 443 U.S. at 132, 97 S.Ct. at 2541 (emphasis added). Regarding the union's equal protection challenge, the Court noted that prison authorities should be given the "full latitude of discretion" concerning "a decision as to which of many groups should be allowed to operate within the prison walls, ... unless it can be firmly stated that the two groups are so similar that discretion has been abused." *Id.* at 136, 97 S.Ct. at 2543.

In *Weaver v. Jago*, 675 F.2d 116, 118 (6th Cir.1982), and *Jihaad v. O'Brien*, 645 F.2d 556, 564 (6th Cir.1981), we have interpreted the decisions in *Bell* and *Jones*, as well as *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (prison regulation prohibiting media interviews with specific individual inmates did not abridge inmates freedom of speech where alternative channels of communication available), to require that a court balance the competing interests at stake when a prisoner constitutionally challenges the validity of a specified prison rule. Although a prisoner "does not have an absolute right to practice his religion in accord with his desires," he is entitled to have a court balance his constitutional claims against legitimate state interests in operating its prisons. *Jihaad*, 645 F.2d at 564; *Weaver v. Jago*, 675 F.2d at 118.[1] *Accord Meadows v. Hopkins*, 713 F.2d at 210; *Thompson v. Commonwealth of Kentucky*, 712 F.2d 1078, 1080 (6th Cir.1983).

Here, the district court was required to balance the needs of the prison authorities with internal security and inmate discipline against the right of the inmates and Church to exercise their religious freedom. Governmental interference with a prisoner's religious practices cannot be justified merely because a particular faith is sympathetic to the religious needs of homosexuals. *Lipp v. Procunier*, 395 F.Supp. 871, 876 (N.D.Cal.1975) (three-judge panel); *cf. Gay Students Org. of Univ. of New Hampshire v. Bonner*, 509 F.2d 652, 662 (1st Cir.1974). "[R]easonable opportunities must be afforded to *all* prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty." *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972) (emphasis added). Where an inmate's religious freedom is at stake, correctional officials may only adopt regulations which are "reasonably and substantially" justified by

---

1. This principle was reaffirmed in *Hudson v. Palmer*, —— U.S. ——. 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), where the Court noted that prisoners "must be provided 'reasonable oppor- tunities' to exercise their religious freedom guaranteed under the First Amendment." *Hudson*, —— U.S. at ——, 104 S.Ct. at 3198 (citing *Cruz v. Beto, supra*).

official concern for internal security and inmate discipline. *Sweet v. South Carolina Dept. of Corrections,* 529 F.2d 854, 863 (4th Cir.1975); *see also O'Malley v. Brierley,* 477 F.2d 785, 795–96 (3d Cir.1973), "Prison restrictions that impinge upon a prisoner's First Amendment right must be carefully scrutinized to ascertain the extent to which they are necessary to effectuate the legitimate policies and goals of the corrections system." *Childs v. Duckworth,* 705 F.2d 915, 920 (7th Cir.1983).

To support their claim that the prohibition against the Church's holding group worship services was substantially related to prison security, prison officials presented considerable testimony which indicated that a strong correlation existed between inmate homosexuality and prison violence. For example, officials testified that at least twenty-six incidents of serious violence involving homosexual relationships among the inmates had occurred between 1970 and 1976, including three homicides. Moreover, the district court noted testimony that stronger inmates have a tendency to engage in predatory homosexual behavior against weaker or effeminate prisoners. According to prison officials, this is done to establish a supremacy in the prison "pecking order" and works to diminish the general stability and discipline of inmate behavior needed to maintain internal order within the prison.

There was also testimony which demonstrated that widespread homosexuality within the prison played a major role in inmate assaults because of love triangles, jealousy among the inmate population and other rivalries which grow out of various homosexual relationships. Often innocent inmates would become the victims of rapes, intimidation, extortion and personal abuse because of the substantial degree of homosexuality conducted within the prison. For these reasons, prison officials testified that they could not sanction an activity that might further expose innocent inmates, who might choose to attend the Church's group meetings, to violent and predatory prisoners. The officials conceded there was no security risk in the movement of

prisoners to and from worship services. However, they claimed that permitting the Church's congregate worship services was unacceptable because it would increase the opportunities for identification of homosexual inmates and for contacts between dangerous inmates and individuals attending the services. Prison officials noted that under the existing conditions they can minimize the potential exposure of known homosexual inmates with more dangerous inmates. Without the challenged regulations, officials maintained that violent inmates would be provided an opportunity to identify potential victims who might otherwise escape the prison "grapevine" for identifying homosexuals.

Because of the undisputed testimony linking inmate homosexuality with prison violence, we are not in a position to say that the reasoning of the prison officials is without factual support. We believe the blanket ban against the holding of group worship services by the Church is reasonably related to the State's interest in maintaining internal security in the prison. Although the plaintiffs were forbidden to hold group services, individual counselling and religious ministry sessions were available for interested inmates and Church officials, indicating the prison officials' attempt to accommodate the plaintiffs' interests in religious freedom with the prison's interest in security and inmate discipline. A review of the record reveals that this alternative to the holding of congregate worship services was not an unreasonable nor an exaggerated response to the threat perceived by prison administrators. Thus, we will try not to second-guess prison administrators on matters relating to prison security, even when those matters affect the constitutional rights of inmates in a manner we find discomforting. *Bell,* 441 U.S. at 531, 99 S.Ct. at 1869; *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. at 128, 97 S.Ct. at 2539; *Pell v. Procunier,* 417 U.S. at 827, 94 S.Ct. at 2806; *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). As long as prison authorities

present evidence to support their judgment that prison security will be undermined in the absence of a challenged regulation, we will not substitute our judgment for theirs. *See Otey v. Best,* 680 F.2d 1231, 1233 (8th Cir.1982); *St. Claire v. Cuyler,* 634 F.2d 109, 114–15 (3d Cir.1980).

On the equal protection claim, plaintiffs contend prison authorities acted impermissibly by allowing prisoners of other faiths and their respective churches to hold group worship services, while denying plaintiffs the same privilege. Undoubtedly, the prison's prohibition against the Church is a distinction among religious faiths that would be subject to question outside of the prison walls. *See Larson v. Valente,* 456 U.S. 228, 244–46, 102 S.Ct. 1673, 1683–84, 72 L.Ed.2d 33 (1982); *Walz v. Tax Commission,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970); *Niemotko v. Maryland,* 340 U.S. 268, 272, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951). *Accord Lynch v. Donnelly,* —— U.S. ——, ——, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984) (the Constitution "affirmatively mandates accommodation, and not merely tolerance, of all religions, and forbids, hostility toward any"). However, the distinction here is one among groups operating within a prison. In this context, decisions by prison administrators "as to which of many groups should be allowed to operate within the prison's walls" are matters within the discretion of prison officials to which the courts should ordinarily defer "unless it can be firmly stated that the two groups are so similar that discretion has been abused." *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. at 136, 97 S.Ct. at 2543. Moreover, prison officials, when making these types of decisions, need not demonstrate an *actual* danger in order to support the reasonableness of their determinations. It is enough to show that a *potential* danger exists without the restrictions of a challenged prison regulation. *See Bell,* 441 U.S. at 551 n. 32, 99 S.Ct. at 1880 n. 32; *Jones,* 433 U.S. at 133 n. 9, 97 S.Ct. at 2541 n. 9. Here, prison officials have sufficiently demonstrated differentiation between the Church and other churches presently permitted to hold group worship services. At the same time, prison officials have shown that this differentiation is tied to prison violence and internal disruption. Thus, their refusal to allow the plaintiffs to hold group worship services, while granting the privilege to other groups, does not constitute a violation of the equal protection clause of the fourteenth amendment. "There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence." *Jones,* 433 U.S. at 136, 97 S.Ct. at 2543.

The judgment of the district court is affirmed.