Mark Lee POLLOCK, Plaintiff,

v.

Ronald C. MARSHALL, et al., Defendants.

Civ. No. C–1–84–235.

United States District Court, S.D. Ohio, W.D.

March 18, 1987.

Mark Pollock, Lucasville, Ohio, for plaintiff.

Raymond Studer, Columbus, Ohio, for defendants.

## ORDER

CARL B. RUBIN, Chief Judge.

This matter is before the Court on defendant Marshall's second motion for summary judgment (doc. 42) and plaintiff's reply (doc. 47); defendant's objection to the magistrate's report and recommendation (doc. 41) and plaintiff's reply (doc. 46); and defendant's supplemental memorandum in support of said objection (doc. 43) and plaintiff's reply (doc. 45).

Plaintiff, an inmate at the Southern Ohio Correctional Facility, seeks an injunction against prison officials prohibiting them from cutting his hair. He alleges that he has a deeply held religious belief in the religion of the Lakota Indians and that belief forbids such haircuts. Plaintiff contends that he is entitled to wear his hair in accordance with his religious beliefs, pursuant to Ohio Administrative Code section 5120-9-25(F), which sets limits on hair length but further states, "These limitations may be modified by the managing officer upon a showing by the inmate that a sincerely held belief of such inmate, deeply rooted in religion, conflicts with these limits." (Doc. 47, p. 2). For the reasons below, defendant's motion for summary judgment is granted.

## I. STANDARD OF REVIEW

■ If this were an ordinary case involving the free exercise of religion, the Court's job would be to determine whether the state's restrictions on hair serve a "compelling" state interest, *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963), or an interest of the "highest order," *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). The fact that plaintiff is a prison inmate, however, changes the nature of the Court's inquiry significantly. *Madyun v. Franzen*, 704 F.2d 954, 958 (7th Cir.1983). As an inmate, plaintiff

simply cannot expect the same freedom from incidental infringement on the exercise of his religious practices that is enjoyed by those not incarcerated. *Id.*

■ Although prisoners do not lose the right to free exercise of their religion by virtue of their incarceration, the circumstances of prison life may require some restrictions on prisoners' exercise of their religious beliefs against the state's legitimate interests in operating its prisons. *Walker v. Mintzes*, 771 F.2d 920, 929 (6th Cir.1985). In a series of cases the Supreme Court has made clear that a prisoner's constitutional rights are subject to a much greater degree of state intrusion than would be allowed outside the prison. "[S]imply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). "A detainee simply does not possess the full range of freedoms of an unincarcerated individual." *Id.* at 546, 99 S.Ct. at 1878. *See Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977) and cases there cited.

The Supreme Court has not given precise guidance as to the proper standard for analysis of prisoner free exercise claims. *Madyun*, 704 F.2d at 959. However, two Supreme Court cases that involve prisoners' first amendment claims, *Pell v. Procunier*, 417 U.S. 817, 825–26, 94 S.Ct. 2800, 2805, 41 L.Ed.2d 495 (1974) and *Procunier v. Martinez*, 416 U.S. 396, 413–14, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1973), illustrate that such claims are to be analyzed under a standard that reflects the fact of incarceration. *Madyun, supra.*

The Sixth Circuit standard for testing the constitutional validity of restrictions on an inmate's free exercise of religion is set forth in the case of *Walker v. Mintzes*, 771 F.2d 920, 930–31 (6th Cir.1985).

Where an inmate's religious freedom is at stake, correctional officials may only adopt regulations which are "reasonably and substantially" justified by official

concern for internal security and inmate discipline.

*Walker,* 771 F.2d at 930, quoting *Childs v. Duckworth,* 705 F.2d 915, 920 (7th Cir.1983).

In the earlier case of *Weaver v. Jago,* 675 F.2d 116, 119 (6th Cir.1982), the United States Court of Appeals for the Sixth Circuit appeared to employ a standard of review that differed from the "reasonably and substantially" justified standard, instead requiring a court to determine whether the prison regulation were "of the highest order."

... [O]nly those [state] interests of the *highest order* and those not otherwise served can overbalance [inmates'] legitimate claims to the free exercise of religion.

*Id.* (emphasis added)

However, in the later cases of *Brown v. Johnson,* 743 F.2d 408, 411 (6th Cir.1984) and *Walker, supra,* the appellate court used the "reasonably and substantially" justified test, and therefore that is the standard this Court will apply. The Court notes, however, that the prison regulation at issue here also would pass constitutional muster if it were tested against the "highest order" standard of *Weaver, supra.*

▉ In order to test whether the regulations are "reasonably and substantially" justified, the Court must engage in a balancing test. *Id.* at 931. The first amendment requires the Court to balance the interests of the state in operating the prisons against the prisoners' constitutionally protected right to the free exercise of their religious beliefs. *Id.*

The United States Court of Appeals for the Sixth Circuit has recognized the need for this balancing test in a number of prisoners' free exercise cases. In *Brown v. Johnson, supra,* the appellate court held that the district court was required to balance the needs of the prison authorities with internal security and inmate discipline against the right of homosexual inmates to hold congregational services as their exercise of religious freedom. In *Weaver v. Jago,* 675 F.2d 116, 118 (6th Cir.1982), the appellate court explained that the plaintiff

inmate, who alleged his Cherokee religious belief prohibited the cutting of his hair, was entitled to have the court balance his constitutional interests against legitimate state interests in operating its prisons. And in *Jihaad v. O'Brien,* 645 F.2d 556, 564 (6th Cir.1981), a case involving a prisoner's claim that wearing a beard was a requirement of his faith, the Sixth Circuit found that, "The needs of the institution and penological objectives must be balanced against the right of the individual prisoner."

## II.  DISCUSSION

▉ Plaintiff asserts that the sincerity of his religious belief is the only question to be resolved in this action, and if the Court finds him to be sincere, he is entitled to relief. (Doc. 47, p. 6). Plaintiff maintains that his sincerity is a genuine issue as to a material fact and therefore summary judgment, pursuant to Fed.R.Civ.P. 56, is inappropriate. However, the sincerity of plaintiff's religious belief is not at issue in this motion. As in *Weaver v. Jago,* 675 F.2d at 118, nothing in the defendant's affidavit supporting his summary judgment motion refutes plaintiff's claim that his hair length has religious significance. Therefore, for the purpose of defendant's motion for summary judgment, asserting as it must under Fed.R.Civ.P. 56 that no genuine issue of material fact exists, plaintiff's religious belief regarding his hair must be taken as true. Furthermore, plaintiff errs in arguing that sincerity is the sole determinative issue in this case. A prisoner's sincere religious belief does not automatically render unconstitutional all incidental prison infringements upon that belief. *Jihaad,* 645 F.2d at 564. In the *Jihaad* case, the United States Court of Appeals for the Sixth Circuit explained that an inmate's sincere religious belief that he must wear a beard did not render unconstitutional any prison requirement that he shave. *Id.* "It is settled that a prisoner does not have an absolute right to practice his religion in accord with his desires. The needs of the institution and penological ob-

jectives must be balanced against the right of the individual prisoner. *Id.* at 564.

The Court's task now is to scrutinize the interests of the parties and balance those competing interests as a matter of law.

■ In defending a prison restriction on a prisoner's exercise of religious beliefs, the state cannot merely assert that its interests require such restrictions. *Walker,* 771 F.2d at 929. The state must prove the necessity of any restrictions it imposes, and it must demonstrate that the prison's restriction was a reasonable time, place, and manner restriction of a first amendment right. *Id. See also Weaver v. Jago,* 675 F.2d 116, 119, quoting *Bell v. Wolfish,* 441 U.S. 520, 552, 99 S.Ct. 1861, 1881, 60 L.Ed.2d 447. Defendant has cleared these hurdles. By affidavit Terry Morris, the Superintendent of the Southern Ohio Correctional Facility, sets forth numerous, valid reasons why the department regulations on hair are both a necessity and a reasonable time, place and manner restriction. (Doc. 43, attached affidavit). The highlights of Superintendent Morris' affidavit are as follows:

(5) "In a prison setting, it is necessary that quick identification of inmates be possible. The growing of hair beyond the established limit hinders the ability to make quick identification.

(6) Such identification is necessary to identify inmates involved in violations of rules of the facility in order to ensure discipline. It is also necessary to identify prisoners for activities such as roll call, mail call, commissary purchases and the issuing of visitor room passes.

(7) Quick identification is also necessary to facilitate the recapture of inmates who may escape. An escaped inmate could cut his hair, hindering his identification.

(8) Hair exceeding the current limit greatly increased the ability of an inmate to hide contraband, such as pills and handcuff keys, in his hair.

(9) Increased hair length would result in the need to spend a longer length of time searching an inmate. This would result in more physical contact between guards and inmates. Such additional contact would result in greater tension between the guards and inmates, resulting in an increased chance of fights between them.

(10) The increased time needed to search longer hair would also increase the need to assign guards to do this, This would result in less time being spent on other security needs.

(11) Homosexuality is a great problem in a prison facility. Longer hair increases the attractiveness of an inmate to other inmates. This increases the likelihood of sexual attacks.

(12) Longer hair creates a greater risk of getting caught in machinery and, therefore, creates a safety problem.

(13) Longer hair has a greater tendency to clog sinks, showers and similiar accommodations creating a sanitation problem.

(14) Longer hair is more conducive to the carrying of lice creating sanitation concerns."

■ With the present case in its summary judgment posture, plaintiff has asserted an unrefuted claim that his right to free exercise of his religious beliefs has been violated. The prison has asserted the necessity of the regulation challenged by plaintiff to promote security, health and safety interests. In order to "scrupulously observe" plaintiff's constitutional rights, the Court must weigh these competing interests. *Weaver,* 675 F.2d at 119.

Similar cases guide the Court in this balancing test. The Sixth Circuit case of *Brown v. Johnson,* 743 F.2d 408 (6th Cir. 1984), involved the rights of homosexual inmates to hold congregational services as their exercise of religious freedom. Prison officials had prohibited inmates affiliated with the Universal Fellowship of Metropolitan Community Churches from participating in group worship services within the prison, while permitting other churches to hold such worship services. *Id.* at 409. This particular church has a special ministry to the spiritual and religious needs of homosexuals, and prison officials recognized the Church as a *bona fide* religion in 1976.

Prison officials maintained that the prohibition against those particular church services was "substantially related" to prison security because a correlation existed between inmate homosexuality and prison violence. *Id.* at 412. The officials claimed that permitting the Church's congregate worship services was unacceptable because it would increase the opportunities for identification of homosexual inmates and for contacts between dangerous inmates and individuals attending the services. *Id.*

In its affirmance, the appellate court held that the prison officials' actions were reasonably related to the state's interest in maintaining internal security in the prison. *Id.* The appellate court gave much deference to the prison officials' decisions on security.

> [W]e will try not to second-guess prison administrators on matters relating to prison security, even when those matters affect the constitutional rights of inmates in a manner we find discomforting. (citations excluded). As long as prison authorities present evidence to support their judgment that prison security will be undermined in the absence of a challenged regulation, we will not substitute our judgment for theirs.

*Id.* at 412–13.

Even when an inmate's first amendment right is at stake, the appellate court emphasized that prison officials should be afforded much discretion in deciding what measures are reasonable in a prison setting.

> Moreover, prison officials, when making these types of decisions, need not demonstrate an *actual* danger in order to support the reasonableness of their determinations. It is enough to show that a *potential* danger exists without the restrictions of a challenged prison regulation.

*Id.* at 413 (no emphasis added).

Another case on point is *Shabazz v. Barnauskas*, 790 F.2d 1536 (11th Cir.1986, Hon. John W. Peck, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.) In *Shabazz* the plaintiff inmate, who alleged that his Islamic faith forbade him from shaving his beard, charged that prison officials violated his first amendment right to freely exercise his religion by forcing him to shave. *Id.* at 1537. The appellate court affirmed a finding that the state's "no beard" rule served a legitimate penological interest in preventing escape. *Id.* at 1538. The Eleventh Circuit applied the "least restrictive alternative" test in deciding whether the regulation were constitutionally sound, rather than the Sixth Circuit's "reasonably and substantially" justified standard in *Brown, supra*. But the result in both cases was the same with the states' interests prevailing.

> Shabazz urges that because the prison has a color photograph of him without a beard and can take a picture of him with a beard, should he escape he can be identified by the photograph that matches his escapee appearance. This is not a basis for reversal. This court is not able to say that preparation, storage, maintenance, and dissemination to the world of law enforcement agencies (and other sources) two photographs to be used to recapture an escapee is a feasible means of furthering the state's interest in identification.

*Id.* at 1540.

Finally, the Supreme Court case of *Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), is highly persuasive. Plaintiff *Goldman*, an Air Force officer who also was an Orthodox Jew and ordained rabbi, contended that the free exercise clause of the first amendment allowed him to wear a yarmulke while in uniform, notwithstanding an Air Force regulation mandating uniform dress for Air Force personnel.

The Supreme Court upheld the constitutionality of the Air Force regulation, despite the infringement upon the plaintiff's sincerely held religious beliefs.

> [The regulations] reasonably and evenhandedly regulate dress in the interest of the military's perceived need for uniformity. The First Amendment therefore does not prohibit them from being applied to petitioner even though their effect is to restrict the wearing of the

headgear required by his religious beliefs.

*Id.* 106 S.Ct. at 1314.

Writing for the majority, Justice Rehnquist emphasized that courts must give "great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Id.* at 1313. Although the plaintiff in *Goldman* was a military man and plaintiff here is a prisoner, both cases involve the free exercise rights of persons who are in state-controlled environments. The Court is not prepared to compel the state to provide a prisoner with a greater degree of religious freedom than the Supreme Court has allowed to a rabbi serving in the military. Similarly, the same deference *Goldman* gives to the "professional judgment of military authorities" should be afforded prison officials making judgment calls on grooming standards related to prison security, safety and discipline.

Moreover, Justice Stevens in his concurrence in *Goldman* noted that enforcement of such regulations best preserves state neutrality in religious affairs.

> For the difference between a turban or a dreadlock on the one hand, and a yarmulke on the other, is not merely a difference in "appearance"—it is also the difference between a Sikh or a Rastafarian, on the one hand, and an Orthodox Jew on the other. The Air Force has no business drawing distinctions between such persons when it is enforcing commands of universal application..... An exception for yarmulkes would represent a fundamental departure from the true principle of uniformity that supports that rule.

*Id.* at 1316.

If plaintiff Pollock were permitted to wear his hair long, then the prison would have to begin drawing distinctions between other prisoners whose sincerely held religious beliefs compel them to wear, for example, dreadlocks as does a Rastafarian, a turban as does a Sikh or a saffron robe as does a Satchidananda Ashram-Integral Yogi. *Id.* at 1319. Just as in *Goldman,* enforcement of a neutral, completely objective standard obviates the need for such line drawing among religious practices.

Ohio Administrative Code Section 5120–9–25 does provide that limits on hair length *"may be modified* by the managing officer upon a showing by the inmate that a sincerely held belief of such inmate, deeply rooted in religion, conflicts with these limits." (emphasis added). Nonetheless, the phrase "may be modified" is important as it suggests that such an exemption is by no means compulsory, nor should it apply to every prison in Ohio. Security levels in Ohio prisons vary. The prison where plaintiff is incarcerated, the Southern Ohio Correctional Facility, is a maximum security prison. Again, just as in *Goldman,* deference to prison officials' judgments on these matters is critical. *Bell,* 441 U.S. at 547–48, 99 S.Ct. at 1878–79.

### III.   CONCLUSION

Defendant's enforcement of the Ohio Administrative Code regulation requiring uniformity in prisoners' hair length, and defendant's refusal to allow an exemption, is reasonably and substantially justified by prison officials' concern for internal security and inmate discipline. *Walker,* 771 F.2d at 930. Balanced against these legitimate state interests, plaintiff's religious practice of wearing his hair longer than allowed by Ohio Administrative Code Section 5120–9–25(F) must yield.

All of the reasons cited in the affidavit (doc. 43) of Terry Morris, superintendent of the Southern Ohio Correctional Facility, evidence the necessity of the regulation challenged and substantiate the regulation as a reasonable time, place and manner restriction of a first amendment right.

In fact, two of Superintendent Morris' reasons for supporting the hair regulation, Nos. 7 and 11, were found to be constitutionally sound in the cases discussed here.

Reason No. 7 states that the regulations on hair is valid because, "Quick identification is also necessary to facilitate the recapture of inmates who may escape. An escaped inmate could cut his hair, hindering his identification." The *Shabazz* case

relied upon a finding in the case of *Griffin v. Duggar,* M.D. Fla., No. 79–758, Sept. 25, 1984, which involved the desire of an American Indian imprisoned in the Florida prison system to wear his hair in long braids. The Court in *Griffin* found that.... "the prison policy concerning haircuts is not an unconstitutional violation of plaintiff's First Amendment right because the regulation facilitates the identification of escaped inmates." *Shabazz,* 790 F.2d at 1539. Although the plaintiff prisoner in *Shabazz* alleged that his religion required him to wear a beard, the appellate court upheld a finding that the prison's "no beard rule" had the same purpose as the "no long hair rule" in *Griffin* (facilitating prompt recapture of escapees). *Id.* at 1540.

Superintendent Morris' reason No. 11 states that, "Homosexuality is a great problem in a prison facility. Longer hair increases the attractiveness of an inmate to other inmates. This increases the likelihood of sexual attacks." Clearly, the United State Court of Appeals for the Sixth Circuit recognized in *Brown, supra,* that deference must be afforded to prison officials who have this concern. Indeed, in *Brown* the appellate court went so far as to uphold a blanket ban on all congregate religious services geared for homosexuals in a prison because of the likelihood of prison violence. *Brown,* 743 F.2d at 409.

The remaining reasons listed in Superintendent Morris' affidavit likewise pass constitutional muster. The United States Court of Appeals for the Sixth Circuit instructs that the Court cannot substitute its judgment for that of prison authorities if those authorities "present evidence to support their judgment that prison security will be undermined in the absence of a challenged regulation." *Id.* at 413. The appellate court in *Brown* also emphasized that when prison officials make these types of decisions, they need not demonstrate an *actual* danger in order to support the reasonableness of their determinations. *Id.* It is enough to show that a *potential* danger exists. *Id.*

Thus, the Court must defer to prison officials' concern that longer hair would greatly increase the ability of an inmate to hide contraband in his hair (No. 8); forces guards to spend more time searching an inmate, resulting in an increased chance of fights (Nos. 9 and 10); and hinders the ability to make quick identification of inmates involved in violating rules (Nos. 5 and 6). The remaining reasons, Nos. 12, 13 and 14, are based on safety and sanitation concerns that likewise deserve the Court's deference. The Supreme Court decision in *Goldman, supra,* gives the Court additional grounds for deferring to prison officials' decisions in this matter.

Accordingly, defendant's motion for summary judgment is hereby GRANTED.

IT IS SO ORDERED.