Rick ESPINOZA and Bruce Roller,
Plaintiffs-Appellants,

v.

George WILSON, William Seabold and
Betty Batts, Defendants-Appellees.

No. 86–5098.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 9, 1986.
Decided March 27, 1987.

William M. Radigan, Walker, Radigan and Zeller, Louisville, Ky., for plaintiffs-appellants.

Barbara Jones, Linda Cooper, David Sexton, Frankfort, Ky., G. Edward Henry II (argued), Clem, Henry and Watz, Lexington, Ky., for defendants-appellees.

Before JONES and RYAN, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

PER CURIAM.

The plaintiffs appeal the district court's grant of summary judgment in favor of the defendants in this prisoners' civil rights case. This action was commenced by Rick Espinoza and Bruce Roller, two former inmates at the Luther Luckett Correctional Complex ("LLCC") located in LaGrange, Kentucky. LLCC is a medium security facility housing 600 inmates. Neither Espinoza nor Roller are presently incarcerated at LLCC; both have been paroled. The two plaintiffs filed a *pro se* complaint against George Wilson (Secretary of the Kentucky Corrections Cabinet), William Seabold (warden at LLCC), and Betty Batts (mailroom clerk at LLCC), alleging violations of the Civil Rights Act, 42 U.S.C. § 1983 (1982). The complaint alleged that the defendant state officials violated the inmates' civil rights by refusing to allow them to receive certain homosexual publications to which they had subscribed while at LLCC. The complaint sought monetary damages and injunctive relief.

Espinoza and Roller were convicted in Mercer Circuit Court in 1980 following the entry of guilty pleas. Each pled guilty to four counts of using a minor for sexual purposes and four counts of sodomy in the first degree. Each was sentenced to 100 years in prison and confined in the Kentucky State Reformatory on June 12, 1980. Immediately upon their placement there, both Espinoza and Roller received threats from other inmates due to their convictions for sex crimes involving a child and being labeled homosexuals. Both men received threats of rape and assault and were labeled "baby rapers" by their fellow inmates. Both men requested protective custody status and remained in that status at the reformatory until they were transferred to the protective custody unit of the Kentucky State Penitentiary on July 29, 1980. Espinoza remained in protective custody status at the penitentiary until approximately three months prior to his May 19, 1981, transfer to LLCC. Roller remained in protective custody status at the penitentiary for approximately one year and was eventually transferred to LLCC on November 2, 1981. Roller remained at LLCC until September 14, 1984; Espinoza remained there until September 21, 1984.

While they were at LLCC, some materials mailed to them were withheld by the prison administration. The prison officials claim that, with few exceptions, the materials were withheld on the grounds that they posed a threat to the security and order of the institution. The classification of this withheld material as a security threat is the sole issue raised by Espinoza and Roller in this case.

The Kentucky Corrections Cabinet requires the screening of all incoming prisoner mail. Mailroom personnel check letters and parcels to assure that prisoners do not receive contraband or other materials detrimental to discipline, order, security or rehabilitative efforts at the prisons. The mail

screening procedures used at LLCC at the time of the complaint were as follows. The mailroom clerk would initially screen incoming mail. If items were considered to be a threat to the security of the institution, they would be forwarded to Steve Adwell, the procedures officer at LLCC, for his review. Each item withheld was judged on its own merits and in its totality to determine whether it would be withheld from plaintiffs. No predetermined list was drawn by Seabold or Adwell setting forth the specific publications that would be withheld from plaintiffs. Instead the officials determined that if a specific publication advocated or legitimized a homosexual lifestyle in totality, then it would be withheld from plaintiffs. The publications that were withheld from plaintiffs were reviewed by Adwell for an individual determination as to whether that publication would pose a threat to the security of the institution. Additionally, from time to time, a literary review committee composed of Seabold, Adwell, and two deputy wardens would review publications that had been withheld to determine if in fact all agreed that the publications would pose such a threat. When a publication was withheld, a rejection notice would be forwarded to the inmate-recipient setting forth the type of publication and the reason for its rejection.[1]

The record reveals that plaintiffs received a great deal of mail. Warden Seabold estimated that on some days plaintiffs would receive ten percent of the total amount of mail received at the institution. There was no policy, either formal or informal, that homosexually-related publications would simply be banned from the institution. Plaintiffs received a great deal of literature that discussed homosexual issues, particularly those of a religious or educational nature and those containing supportive materials or medical information. Plaintiffs were also allowed to receive photographs of nude men. Such photographs were withheld only if they depict-

ed sexual acts. Sexually explicit photographs were withheld under the obscenity section of the policy and procedures of the Corrections Cabinet. Espinoza stated in his deposition that he received gay-related publications and that on an average day he would receive between 10 and 25 pieces of mail. He estimated that approximately ten percent of his mail was withheld and, of the ninety percent of the mail that he received, approximately 50 percent of it was gay material or letters from gay friends.

In his deposition, Warden Seabold stated that his decision to withhold certain homosexual publications from the plaintiffs was made in the interests of inmate safety and institutional order. The plaintiffs contended before the district court that, despite Warden Seabold's fears, they were not mistreated by their fellow inmates while at LLCC, nor were they a cause of disorder within the institution even though they were open about their homosexuality. The plaintiffs also stated that while incarcerated in other Kentucky prison facilities, they were allowed to receive many of the publications withheld at LLCC. They further argued that the receipt of those publications while at LLCC would have caused neither mistreatment nor disorder.

The parties filed opposing motions for summary judgment, and on December 18, 1985, the district court granted the defendants' motion. In its opinion, the court concluded that:

> Although [there] is *some* evidence that the defendants may have overreacted to the censored materials, it does not constitute substantial evidence of overreaction. Nor does the fact that the court might consider some of the publications innocuous outweigh the deference it must accord to Warden Seabold's fifteen years of experience in the Corrections Cabinet. Accordingly, the court defers to Warden Seabold's opinion that the plaintiffs were made safer and that LLCC, an institution with a prisoner population like none oth-

---

1. The list of publications actually withheld is long. Numerous issues of the Gay Community News and the Advocate were withheld from plaintiffs. Certain issues of the Gay Con Press

News Letter, RFD, the Torch, Bay Area Reporter, Nambla Bulletin, and the Saint Priapus Church News Letter and miscellaneous other publications were also withheld.

er in [Kentucky], was made more secure by holding back certain homosexual publications.

The court notes that not all homosexual oriented publications were withheld from the plaintiffs. Publications providing medical and religious counselling to homosexuals were delivered. The materials that were withheld, however, were characterized by Warden Seabold as condoning homosexuality and ... were prohibited because such materials might provoke violent reactions from other inmates. Because censorship of the plaintiffs' mail was based on an objective concern for their safety, the court finds that withholding of certain homosexual periodicals was a permissible abridgement of the inmates' first amendment rights in order to secure the governmental interests in discipline, order, and security.

App. at 81–82 (emphasis in original). In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court articulated four principles to consider when a prison rule or regulation is attacked on constitutional grounds. First, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Id.* at 545, 99 S.Ct. at 1877. A prisoner retains those rights that are "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *See Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Second, merely because prisoners "retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations.... There must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.'" *Bell,* 441 U.S. at 545–46, 99 S.Ct. at 1877–78 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974)). Third, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights" of convicted prisoners. *Id.,*

441 U.S. at 546, 99 S.Ct. at 1877. Finally, prison officials

should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Id.* at 547–48, 99 S.Ct. at 1878–79 (quoting *Pell,* 417 U.S. at 827, 94 S.Ct. at 2806). The Court applied these principles in *Bell,* and found that a prison's prohibition against inmates' receiving hardback books not mailed directly from publishers did not violate the inmates' first amendment rights because the prohibition was a rational response to an obvious security problem and there were alternative means available for inmates to obtain reading material. *Id.,* 441 U.S. at 550–52, 99 S.Ct. at 1880–81.

The Supreme Court has on other occasions upheld prison regulations that have infringed on the first amendment rights of inmates. In *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), the Court held that the first amendment was not impermissibly infringed upon when state prison officials prohibited a prisoners' union from soliciting other inmates to join the union, barred all meetings of the union, and refused to deliver packets of union publications that had been mailed in bulk to several inmates for redistribution among other prisoners. The Court noted that first amendment rights "may be curtailed whenever the institution's officials in the exercise of their informed discretion, reasonably conclude that such associations ... possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment." *Id.* at 132, 97 S.Ct. at 2541. Further, in *Pell,* 417 U.S. 817, 94 S.Ct. at 2800, the Court upheld a

prison regulation prohibiting media interviews with specific individual inmates because alternative channels of communication were available.

The Supreme Court, however, has not hesitated to declare unconstitutional those regulations that are in no "way necessary to the furtherance of a government interest unrelated to the suppression of expression." *Procunier v. Martinez*, 416 U.S. 396, 415, 94 S.Ct. 1800, 1812, 40 L.Ed.2d 224 (1974). In *Martinez*, the Court held that prison officials could not censor inmate mail simply because it was unflattering or uncomplimentary. The Court stated that inmate mail could be censored only if the following criteria were met: "First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression.... Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.* at 413, 94 S.Ct. at 1811. The Court also cautioned that "a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad." *Id.* at 413–14, 94 S.Ct. at 1811–12.

The Sixth Circuit has had several opportunities to interpret these Supreme Court cases. This court has interpreted these cases as "requir[ing] that a court balance the competing interests at stake when a prisoner constitutionally challenges the validity of a specified prison rule.... [A] prisoner ... is entitled to have a court balance his constitutional claims against legitimate state interests in operating its prisons." *Brown v. Johnson*, 743 F.2d 408, 411 (6th Cir.1984). This court, like the Supreme Court, has upheld prison regulations that have infringed on the first amendment rights of inmates. However, those "limitations must be no greater than is necessary to protect the particular governmental interest involved." *Patterson v. Mintzes*, 717 F.2d 284, 289 (6th Cir.1983).

In *Brown*, the court was presented with the issue of whether a Michigan prison

could prohibit inmates from participating in the group worship services of a church that ministered to the religious needs of homosexuals, but did not encourage homosexual behavior. The inmates claimed that such a prohibition violated their first amendment rights and was not justified by the institution's needs for internal security and inmate discipline. The prison officials had testified that there was a strong correlation between prison violence and inmate homosexuality. Numerous incidents of violence involving homosexual relationships had occurred over a six year span, including three homosexual-related murders. The officials also testified that homosexuality played a major role in inmate assaults, rapes, intimidation, extortion and personal abuse. Consequently, the prison officials believed that they could not sanction an activity that might further expose innocent inmates to increased dangers, increase the opportunities for identification of homosexual inmates, and increase the ability of dangerous inmates to target homosexual inmates.

This court held that the regulation did not violate the first amendment rights of the inmates. The court concluded that such a ban against group services was necessary and reasonably related to the state's interest in maintaining security. The court also found that the actions taken by the prison officials were not an exaggerated response to the perceived threat. In this regard, the court stated:

> [W]e will try not to second-guess prison administrators on matters relating to prison security, even when those matters affect the constitutional rights of inmates in a manner we find discomforting. As long as prison authorities present evidence to support their judgment that prison security will be undermined in the absence of a challenged regulation, we will not substitute our judgment for theirs.

*Brown*, 743 F.2d at 412–13 (cites omitted). The court finally concluded that "prison officials, when making these types of decisions, need not demonstrate an *actual* danger in order to support the reasonableness of their determinations. It is enough to

show that a *potential* danger exists without the restrictions of a challenged prison regulation." *Id.* at 413 (emphasis in original).

This court was faced with a somewhat similar issue in *Abdullah v. Kinnison*, 769 F.2d 345 (6th Cir.1985). There the court was presented with the question of whether a prison regulation that allowed Hanafi Muslim inmates to wear white prayer robes only during church services, and prohibited the wearing of those robes at other times, violated their first amendment rights. The court, relying on *Brown*, found that the security interests set forth by the prison superintendent were legitimate. The superintendent asserted that the robes posed a security risk in several respects because they could: (1) be used to conceal weapons or contraband, (2) allow a prisoner to walk out of the prison dressed as a civilian Muslim, (3) be modified to resemble other civilian dress, (4) frustrate the color-coded clothing system used to identify the inmates. The court concluded that "these security interests are legitimate and on their face provide adequate justification for the limited restriction of appellants' First Amendment rights." *Id.* at 349–50.

In *Meadows v. Hopkins*, 713 F.2d 206 (6th Cir.1983), the court addressed the question of whether Bureau of Prisons regulations that authorized the reading of prisoners' mail constituted an unconstitutional infringement of first amendment rights. The prisoners argued that the regulations were overbroad and that the security purposes of the regulations could be accomplished using less intrusive methods. They also argued that the first amendment did not permit the reading of prisoners' mail unless prison officials had cause to believe that the mail included offensive material. The court found that the regulations did not violate the first amendment, and noted that "[t]he governmental interest which is furthered by mail regulation is obviously prison security and order." *Id.* at 210. The court also concluded that "the regulations are clearly designed to promote the judicially sanctioned interests of security, order and rehabilitation." *Id.* at 211.

These cases clearly establish that an inmate's first amendment rights may be restricted by prison regulations provided the restriction is reasonably related to a legitimate penological interest and the restriction is no greater than is necessary to protect the particular interest involved. A review of Warden Seabold's deposition reveals that he had two major reasons for withholding the publications from the plaintiffs. The first was that allowing those publications that advocated homosexuality into the prison would encourage and condone homosexuality and would thus be a danger to the security of the prison. The second was that if the plaintiffs received these publications, other inmates would know that they were homosexual and would possibly do them harm.

■ Warden Seabold's second reason is unsupported by the record and does not withstand scrutiny. He admitted in his deposition that "neither [plaintiff] tried to hide the fact that they were homosexual." Warden Seabold knew that the two were homosexuals, as did the prison staff and the other inmates. Additionally, the warden stated that the plaintiffs were allowed to receive homosexual publications that were educational and provided counselling. These publications would certainly have alerted other inmates that the plaintiffs were homosexuals. In *Brown*, part of the reason that the worship services were banned was that "violent inmates would be provided an opportunity to identify potential victims who might otherwise escape the prison 'grapevine' for identifying homosexuals." 743 F.2d at 412. There was no such danger in the instant case because the plaintiffs had already been identified as homosexuals by their fellow inmates. Therefore, their receipt of the withheld publications would not have led to their identification as homosexuals.

■ The warden's first reason, however, does withstand scrutiny. He claims that homosexuality poses a security problem in all prisons and publications that advocate homosexuality increase the dangers presented by homosexuality. The warden, who has a great deal of experience in the

Kentucky penal system, testified extensively on the dangers posed by homosexuality in the prisons. He indicated that a recent murder at LLCC and the burning of a homosexual inmate were directly linked to homosexual activity.

The Third Circuit has noted that:

[T]he state needs only to produce evidence that to permit the exercise of first amendment rights would create a potential danger to institutional security. This evidence may consist of expert testimony from the responsible officials, provided they testify to opinions that are "held 'sincerely' and [are] arguably correct." Once the state has met its burden of going forward with the evidence, the courts must defer to the expert judgment of the prison officials unless the prisoner proves by "substantial evidence ... that the officials have exaggerated their response" to security considerations.

*St. Claire v. Cuyler,* 634 F.2d 109, 114–15 (3rd Cir.1980) (citations and footnote omitted). The defendants did meet their burden of producing evidence that the withheld publications would create a potential security danger to institutional security. Although the plaintiffs did present substantial evidence rebutting one of the two justifications advanced by the warden, they failed to present substantial evidence that the other justification was exaggerated. The plaintiffs argue that since the warden could not demonstrate a specific problem relating to the receipt of a particular publication, he could not withhold the publication. The plaintiffs are claiming, in essence, that unless the warden can prove that a publication actually has caused an incident, he cannot withhold that publication. However, this court has noted that an actual danger need not be demonstrated, it is enough to show that a potential danger exists. *See Brown,* 743 F.2d at 413. The defendants have shown that a potential danger does exist.

It should also be noted that the warden has not withheld all homosexual publications. He has only withheld those that advocate homosexuality, because in his view they pose a danger to the institution. If he had withheld all homosexual publications, regardless of their nature, then he would have violated this court's requirement that restrictions placed on first amendment rights be no greater than is necessary to protect the particular governmental interest involved. *See Patterson,* 717 F.2d at 289.

The Supreme Court has stated that prison officials should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878. Prison officials are thus given wide discretion to implement those policies they deem necessary to preserve internal order and security. Provided the officials "present evidence to support their judgment that prison security will be undermined in the absence of a challenged regulation, [a court] will not substitute [its] judgment for theirs." *Brown,* 743 F.2d at 413. Warden Seabold was operating within the wide discretion he is given and he did present evidence to support his judgment. Consequently, his decision to withhold certain publications is appropriate.

Accordingly, the judgment of the district court is AFFIRMED.