In the

# United States Court of Appeals
## For the Seventh Circuit

No. 03-3600

WILLIAM ALAN RUSSELL and
MARK E. GARRIOTT,

*Plaintiffs-Appellants*,

*v.*

J.D. RICHARDS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP 02-901-C-T/K—**John Daniel Tinder**, *Judge*.

ARGUED FEBRUARY 25, 2004—DECIDED SEPTEMBER 16, 2004

Before EASTERBROOK, ROVNER, and WILLIAMS, *Circuit Judges*.

ROVNER, *Circuit Judge*.  Plaintiffs William Alan Russell and Mark E. Garriott were incarcerated in the Johnson County, Indiana, jail in 2001. They filed this suit pursuant to 42 U.S.C. § 1983 against then-Sheriff J.D. Richards, contending that the jail's policy of directing incoming inmates to use a delousing shampoo violated their Fourteenth Amendment due process right to be free from unwanted medical treatment. The district court entered summary judgment in favor of Richards. We affirm.

# I.

Russell and Garriot were arrested on separate occasions in 2001 for minor, non-violent offenses and were taken to the Johnson County jail. On arrival at the jail, they were subject to the jail's delousing policy, which we describe below. The record does not reveal the date that the jail implemented this policy, but according to Richards' witnesses, the policy has been in place for a number of years.

Before entering the general population of the Johnson County jail, each incoming inmate is handed a small cup of Liceall brand delousing shampoo and is told to apply it to his scalp and rinse it out while showering. No one at the jail monitors the inmate to verify that he has used the shampoo as instructed, however. In fact, as far as the jail is concerned, any inmate may refuse to apply the shampoo, although inmates are not told that they have this right.

The jail administers delousing shampoo to new inmates in an effort to avoid lice infestations. Occasionally, lice are discovered on an inmate within the general population of the jail. When this happens, the jail (because it is difficult to determine whether that inmate has spread lice to others) treats the inmate's entire cell block as if it were contaminated. Everyone on that inmate's cell block is deloused, and the cell block itself (including the bedding, floors, and walls) is disinfected. This is no small task: delousing just one inmate and disinfecting his bedding and bunk area takes approximately 25 minutes. Moreover, if the jail suspects that the infected inmate has traveled to another cell block, that block is disinfected as well. The jail has experienced a number of lice outbreaks in past years, although officials were unable to specify exactly when. An official recalled one occasion on which the entire jail had to be disinfected.

There are some shortcomings in the jail's efforts to avoid such infestations by administering the delousing shampoo to new inmates, which may help to explain why the jail, by

its own admission, finds itself disinfecting one or more cell blocks every six months or so. First, inmates are not told that they should leave the delousing shampoo in their hair for ten minutes, as the instructions accompanying Liceall shampoo advise. Second, as we have noted, no effort is made to ensure that an inmate uses the shampoo at all. Third, inmates are not asked to follow-up the initial application of Liceall with a second application seven to 10 days after the first, as the instructions recommend. Fourth, lice can infect not just the scalp but other areas of the body, but no prophylactic efforts are taken to address anything but head lice.

The instructions accompanying the delousing shampoo advise "caution" in use of the shampoo by individuals who are allergic to ragweed. (The record does not reveal what type of reaction such individuals might have to the shampoo.) The jail does not ask an inmate whether he is allergic to ragweed before giving him the delousing shampoo, nor does it warn the inmate that he might experience an adverse reaction to the shampoo if he does have such an allergy. So far as the record reveals, however, neither Russell nor Garriott has such a ragweed allergy and neither suffered any adverse reaction to the shampoo.

## II.

Russell and Garriot contend that the jail's policy of instructing new inmates to use a delousing shampoo amounts to involuntary medical treatment. Delousing shampoos do contain chemicals (piperonyl butoxide and pyrethrum extract) that kill lice. A prescription is not required in order to procure a delousing shampoo, however; and the brand of shampoo used by the jail contains the same active ingredients, and in the same proportions, as the over-the-counter products. Nonetheless, the Indiana pharmacist whose affidavit Richards has made part of the record describes

delousing shampoos as medications, and Richards does not contest the notion that use of a delousing shampoo constitutes medical treatment. Like the district court, we shall therefore assume without deciding that it does. Accepting that premise, the jail's policy of directing an inmate to use a delousing shampoo would implicate the inmate's constitutionally-protected interest in refusing unwanted medical treatment. *See Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 278-79, 110 S. Ct. 2841, 2851 (1990); *Washington v. Harper*, 494 U.S. 210, 221-22, 110 S. Ct. 1028, 1036 (1990).[1]

*Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987), holds that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Although *Turner* dealt with restrictions on inmate marriages and correspondence between inmates, its standard "applies to *all* circumstances in which the needs of prison administration implicate constitutional rights," *Harper*, 494 U.S. at 224, 110 S. Ct. at 1038 (emphasis ours), even if the right infringed upon is a fundamental one, *id.* at 223, 110 S. Ct. at 1037 (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S. Ct. 2400, 2404-05 (1987)). The *Turner* reasonableness standard thus applies to claims involving involuntary medical treatment. *Harper*, 494 U.S. at 223-24, 110 S. Ct. at 1037-38.

*Turner* identifies four factors that bear on the reasonableness of the impinging regulation: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to

---

[1] Russell and Garriot apparently were pre-trial detainees at the jail. Pre-trial detainees have at least those rights enjoyed by convicted inmates. *Riggins v. Nevada*, 504 U.S. 127, 135, 112 S. Ct. 1810, 1815 (1992).

justify it," 482 U.S. at 89, 107 S. Ct. at 2262 (quoting *Block v. Rutherford,* 468 U.S. 576, 586, 104 S. Ct. 3227, 3232 (1984)); (2) "whether there are alternative means of exercising the right that remain open to prison inmates," *id.* at 90, 107 S. Ct. at 2262; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," *ibid.*; and (4) whether there is a ready alternative to the policy "that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests," *id.* at 90-91, 107 S. Ct. at 2262.

Applying the three *Turner* factors that are relevant to involuntary medical treatment, *see Harper*, 494 U.S. at 224-25, 110 S. Ct. at 1038,[2] we conclude first that there is a satisfactory connection between the jail's policy and the interest put forward to justify it. The jail has an obligation to ensure the safety and medical well-being of its inmates and its personnel, *see id.* at 225-26, 110 S. Ct. at 1039, and toward that end the jail has a legitimate interest in preventing its inmate population and staff from being exposed to lice, not to mention a legitimate fiscal interest in avoid-

---

[2] *Harper* deems the second *Turner* factor—whether any alternative means of exercising the right in question remain open to the inmate—irrelevant in the context of involuntary medical treatment, for the obvious reason that the involuntary nature of the treatment deprives the inmate of any choice. *See* 494 U.S. at 224-25, 110 S. Ct. at 1038. As we have noted, however, although the jail instructs each inmate to use the delousing shampoo, it does not watch the inmate to make sure that he has used the shampoo as instructed and, indeed, the jail maintains that it would not compel the inmate to use the shampoo if he objected. Nonetheless, the inmate is not advised that he has the right to disregard the instruction, and in view of the coercive character of the jail environment, it is fair to assume that an inmate will not readily surmise that he has this option. Consistent with *Harper*, then, we shall dispense with consideration of the second *Turner* factor.

ing the costs associated with eradicating a lice infestation. There is a valid, rational connection between those interests and the jail's prophylactic approach of giving a cup of delousing shampoo to each inmate when he arrives at the jail and instructing him to use it in the shower. To be sure, the policy might be more effective if the jail also instructed the inmate to leave the shampoo in his hair for the recommended period of 10 minutes, made sure that the inmate had, in fact, used the shampoo, and/or supplied a follow-up dose of the shampoo as recommended by the manufacturer. In the absence of such steps, it is possible that some prisoners with head lice do not use the shampoo or do not use it properly and consequently go on to infest their environs and other inmates. It is also possible that because the jail's policy is aimed only at head lice, an incoming prisoner with lice elsewhere on his body may expose the population of the jail to those lice notwithstanding the application of the delousing shampoo. But the fit between the jail's legitimate interests and its policy need not be perfect in order to survive scrutiny, it need only be rational. *Waterman v. Farmer*, 183 F.3d 208, 215 (3d Cir. 1999); *see also Turner*, 482 U.S. at 89-90, 107 S. Ct. at 2262 ("a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational"). On the current record, we have no reason to believe that significant numbers of inmates ignore the instruction to use the delousing shampoo, that they rinse the shampoo out of their hair too quickly to have any impact on head lice, or that they are much more likely to be infected with lice elsewhere on their body than they are on their heads. We are, therefore, satisfied that there is a legitimate, logical nexus between the jail's delousing policy and the interests offered to justify that policy.

We next consider what impact that accommodation of the asserted constitutional right would have on guards and other inmates, as well as prison resources generally. As the

right at issue here is an inmate's right to refuse medical treatment, accommodating that right would mean, presumably, that an inmate would be asked to use the shampoo but also told that he is not required to do so. Thus, an infected inmate could decline to use the shampoo, enter the general population of the jail, and expose other inmates and prison staff members to infestation. The fact that the jail has endured a number of lice outbreaks in the past demonstrates that this is more than an abstract possibility. Permitting the individual inmate to reject the delousing shampoo thus would place the health and sanitation of other prisoners and jail staff at risk and give any inmate exposed to lice a potential ground for a lawsuit. *See Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d Cir. 1993) (recognizing that, under the Eighth Amendment, "inmates do have a right to be free of conditions that generate infestations of vermin"). Permitting that choice also would place additional burdens on jail resources. As discussed above, once a lice outbreak occurs, the jail must not only disinfect the cellblock where the infestation is discovered, but any additional cellblocks that an infected inmate has visited. The record reveals that to be a time-consuming process, if nothing else.

Finally, we must consider whether there is a ready alternative to the jail's current policy that would fully accommodate a prisoner's right to refuse medical treatment while posing only *de minimis* costs to the jail's legitimate penological interest in preventing lice outbreaks. The plaintiffs suggest that in lieu of administering delousing shampoo to all new inmates, the jail could have someone examine each inmate's hair and scalp (if not his entire body) in an effort to identify whether that inmate is infected with lice; presumably, then, only infected inmates would be directed to use the shampoo. But the record before us does not permit an assessment as to either the effectiveness or the cost of that alternative. The detection of lice presumably would require a close inspection by a trained staff member; but whether this

would significantly lengthen the medical examinations that the jail already performs on incoming inmates is not a question that the limited evidence in the record answers. The record also does not tell us how effective a visual inspection of one's person would be in detecting lice. There may also be some inmates who would regard the close level of inspection required in order to detect lice as a more intrusive measure than being handed a cup of delousing shampoo. *See Hamilton v. Schriro*, 74 F.3d 1545, 1555 n.12 (8th Cir. 1996) (rejecting the notion that prison should search each inmate's hair for contraband rather than requiring him to keep his hair short: "such means would be impractical and just as likely to burden constitutional interests") (quoting *Phipps v. Parker*, 879 F. Supp. 734, 736 (W.D. Ky. 1995)).

On balance, then, the record does not support the conclusion that the jail's policy with respect to delousing shampoo amounts to an unreasonable intrusion on an inmate's constitutional rights. Directing each new inmate to apply delousing shampoo is a logical way to address the jail's legitimate interest in avoiding outbreaks of lice. Presenting an inmate with the choice of refusing the shampoo would potentially increase the risk of exposing other inmates and jail workers to infestation, particularly in the absence of evidence suggesting that there is any alternative that would be as effective and no more costly in detecting lice and preventing their spread.

We reject the plaintiffs' suggestion that in addition to the *Turner* factors, the jail should also be required to show, inter alia, that no inmate is instructed to use delousing shampoo unless a medical professional first has determined that the inmate has lice, that application of the shampoo is medically necessary and appropriate for that inmate (taking into account possible side effects, for example), and that there is no less intrusive means of ridding the inmate of the lice. The plaintiffs construe three post-*Turner* cases dealing

with the involuntary administration of antipsychotic medications—*Harper*, *Riggins v. Nevada*, 504 U.S. 127, 112 S. Ct. 1810 (1992), and *Sell v. United States*, 539 U.S. 166, 123 S. Ct. 2174 (2003)—to require such heightened proof. *Harper* itself makes clear, however, that it is the *Turner* analysis that governs the involuntary administration of medicines to prison inmates. 494 U.S. at 223-24, 110 S. Ct. at 1037-38. *Harper* did go on to say that the involuntary administration of antipsychotic medications to an inmate will pass the *Turner* test so long as the inmate poses a danger to himself and others and antipsychotic medications are in that inmate's medical interest. *Id.* at 227, 110 S. Ct. at 1039-40. However, *Harper* imposed those requirements in the context of the particular interest asserted (addressing the danger that an untreated mentally ill inmate posed to himself and to others) and the particular antipsychotic medications at issue. *See, e.g., id.* at 214 n.1, 110 S. Ct. at 1032 n.1.[3] *Riggins* and *Sell* amplified on *Harper*'s requirements in addressing the distinct question of when a defendant may be compelled to take antipsychotic medications in order to be rendered competent to stand trial. *See Riggins*, 504 U.S. at 135-36, 112 S. Ct. at 1815-16; *Sell*, 539 U.S. at 178-183, 123 S. Ct. at 2183-86. None of these three cases purports to alter the *Turner* standard or to address anything but the involuntary administration of antipsychotic medications. Delousing shampoo, to the extent that it is fairly characterized as a medication, poses a much less

---

[3] *Harper* also recognized that the State policy authorizing the involuntary administration of antipscyhotic medications to inmates under specified conditions gave rise to a liberty interest to be free from the arbitrary administration of such medications, 494 U.S. at 221, 110 S. Ct. at 1036, and that this liberty interest in turn required certain procedural protections to ensure that the decision to medicate an inmate against his will was neither arbitrary nor capricious, *id.* at 228-36, 110 S. Ct. at 1040-44. The jail's delousing policy gives rise to no such interest.

serious intrusion on an inmate's automony than does an antipsychotic medication: it is an over-the-counter product that is applied externally and is not mind-altering. It requires special caution only when used by persons with ragweed allergies. The particular showings that *Harper*, *Riggins*, and *Sells* required vis-à-vis antipsychotic medications are not necessary in this context.

So far as the record reveals, the only potential harm that use of the delousing shampoo poses to inmates at the jail is a possible reaction by those inmates with ragweed allergies. But, so far as the record reveals, the plaintiffs themselves do not have such allergies nor did they suffer any adverse reaction to the shampoo. They are, consequently, not in a position to complain about such any such potential adverse effects.[4]

What the plaintiffs are in a position to complain about is the interference with their liberty interest in refusing unwanted medication. But, on weighing the factors set out in *Turner*, we have concluded that the minimal interference with that interest resulting from the jail's delousing policy is justified. The defendant was therefore entitled to summary judgment on the plaintiffs' due process claim.

## III.

We AFFIRM the district court's entry of summary judgment in favor of defendant-appellee Richards.

---

[4] Although Russell and Garriot filed this suit as a class action, the district court never certified a class.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*