**Harold WILLSON, III, Plaintiff,**

v.

**Superintendent Eddie BUSS,
Defendant.**

No. 3:03 CV 0921 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

March 31, 2005.

Jacquelyn E. Bowie–Suess, Kenneth, J. Falk, Indianapolis, IN, for Plaintiff.

Thomas D. Quigley, Indianapolis, IN, for Defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

In this civil action brought pursuant to 42 U.S.C. § 1983, plaintiff Harold Willson alleges that a rule adopted and enforced at the Westville Correctional Facility ("WCF") violates his rights under the First Amendment. He asks the Court to award him damages against defendant WCF Superintendent Eddie Buss for enforcing that rule against him.

The case is presently before this Court on plaintiff's motion for partial summary judgment and defendant's motion for summary judgment. For the reasons set forth below, the plaintiff's motion for partial summary judgment is DENIED. The Defendant's motion for summary judgment is GRANTED.

## FACTS

Harold Willson was incarcerated at WCF from September 27, 2000 to October 7, 2003. (Amended Complaint [hereinafter, "Complaint"], ¶ 4; Answer to Amended Complaint [hereinafter, "Answer"], ¶ 6.) Willson wished to obtain a subscription to "Out" magazine and "The Advocate" magazine so that he could receive those magazines during his incarceration. (Complaint, ¶ 6). Willson requested the magazines several times through verbal requests and with a "remittance slip" required to order magazines. (Complaint, ¶ 7; Answer, ¶ 8).

Defendant Eddie Buss became Superintendent of WCF in June 2002 (Buss Dep., p. 28). He had been superintendent at WCF for 23 months at the time of his deposition. (*Id.* at 3). He had been employed by the Indiana Department of Corrections for 17 years (*Id.* at 4), and at various times served as a correctional officer, sergeant, lieutenant, captain, Custody Supervisor, and Assistant Superintendent. (*Id.* at 28–29).

"Out" magazine and "The Advocate" magazine are described by the plaintiff as "both general interest magazines directed toward issues relevant to homosexual individuals." (Plaintiff's Mem. in Support of Partial Summary Judgment at 3). "The Advocate" bills itself as "The National Gay and Lesbian News Magazine." (Buss Dep. p., 12–13; Buss Dep. Ex. 3). The magazines do not contain sexually graphic material. (Buss Dep. Ex. 3). At various steps of the grievance process, the plaintiff described the magazines as "basically the homosexual version of People and Newsweek, respectively." (Joint Ex. 4). He further stated that "[a]ll articles are homosexual in nature," and "the articles are featured [and] geared for the homosexual lifestyle." (Joint Ex. 4).

Willson's requests for the magazines were denied, and he was informed by WCF officials that those magazines were not permitted in the facility because they contained "blatant homosexual materials" that are prohibited due to concerns for "safety, security, and orderly operation of the facility." (Complaint, first ¶ 10; Attachments 1–5 to Complaint).

According to Westville Correctional Facility General Rules and Procedures, 2002 (hereinafter "WCF Rules"), § XII(D):

> Incoming magazines and newspapers will be screened for content. Denial of a publication will generally be based upon a determination that it is obscene under Indiana Statutes or that it jeopardizes the safety, security, or orderly operation of the facility. Nude or seminude photographs and *blatant homosexual materials are not permitted.*

(emphasis added). (Complaint, second ¶ 10; Answer, ¶ 2). Defendant Buss has personally administered this rule, and he is ultimately responsible for its enforcement. (Complaint, ¶ 11; Answer, ¶ 2; Buss Dep., p. 13). WCF Rule XII(D) prohibits "blatant homosexual materials," which, according to Defendant Buss, prohibits an item "[i]f it's obvious, it's clear, by reading it or looking at it, that it's homosexual material." (Buss Dep., p. 15). "Blatant," according to Buss, means "obvious, clear." (Buss Dep., p. 11). Buss stated that "blatant homosexual material would include anything that infers that two people are engaged in a homosexual relationship (Buss Dep., p. 11–12"). It could also include material that would not be widely read by heterosexuals (*Id.* at 13), material that is perceived as advocating homosexuality as a lifestyle (*Id.* at 15–16), material that "infers homosexual activity or behavior" (*Id.* at 18), and material that would potentially label the recipient of the material as homosexual (*Id.* at 23). Buss considers "The Advocate" and "Out" magazines to be "blatant homosexual material," under

WCF Rule XII(D), and therefore Willson was not permitted to receive it. (*Id.* at 13, 14–15). At all times Buss's actions have been taken under color of state law. (Complaint, ¶ 25; Answer, ¶ 2).

The stated goal of the rule in question is to keep out of the prison anything that would lead a prisoner to believe another prisoner was homosexual. (Buss Dep., p. 20; Plaintiff's Mem. in Support of Partial Summary Judgment, at 6; Defendant's Mem. in Support of Summary Judgment, at 3). This is because homosexual offenders could be targeted by other offenders if the other offenders knew he was homosexual. (Buss Dep., p. 20). Once known or thought to be homosexual, an offender can be targeted for sexual gratification, other physical abuse, and extortion. (*Id.* at pp. 20–21, 31). Buss has witnessed and investigated violence or extortion against inmates in the past because they were believed to be homosexual. (*Id.* at 32).

The rule is also enforced because of the nature of WCF. That facility houses approximately 2,800 male offenders who are double-bunked (*Id.* at 33–34, 44). The offenders "live in open day rooms: dormitories built without privacy in mind." (Defendant's Mem. in Support of Summary Judgment, at 4). The dormitories hold as many as 200 men, and each of those men has access to the other men in the dormitory. (Buss Dep., p. 33). WCF is the Department of Corrections' Level 2 Sex Offender Management facility, and it houses most of the sex offenders in Indiana who are classified to security Level 2. (*Id.* at 26).

Following his release from prison, Willson filed this lawsuit against Defendant Buss.

## STANDARD OF REVIEW

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56©; *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Bragg v. Navistar Int'l Trans. Corp.,* 164 F.3d 373 (7th Cir.1998). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting FED.R.CIV.P. 56); *Larimer v. Dayton Hudson Corp.,* 137 F.3d 497 (7th Cir.1998). A question of material fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts shows that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings, *Weicherding v. Riegel,* 160 F.3d 1139 (7th Cir. 1998); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918 (7th Cir.1994); nor may that party rely upon conclusory allegations in affidavits. *Smith v. Shawnee Library Sys.,* 60 F.3d 317, 320 (7th Cir. 1995).

During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560 (7th Cir.1996). Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson,* 477 U.S. at 252–55, 106 S.Ct. 2505. Applying the above standard, this Court will now address the motions before it.

### DISCUSSION

### I. Introduction

There are increasing numbers of constitutionally protected privacy rights in open society that may not be protected in the prison context. To be sure, *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) has now been given a decent judicial burial in *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003); *but see Boy Scouts of America v. Dale,* 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). However, it is not argued here that there is a constitutionally protected privacy right to engage in consensual homosexual relationships in the prison. The advocate for the plaintiff here has specifically belied any such argument before this Court. Beyond any doubt, the expectation of privacy under the Fourth Amendment of the Constitution of the United States is severely limited. *See Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The right to free exercise of religion is generally honored, but certain rituals and practices that inhere in that right in open society may be severely limited or prevented in the prison context. For example, the kind of animal sacrifice that is included as part of religious liberty in *Church of the Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) would be wholly inappropriate in the prison settings. Even simpler religious rituals would not be permissible under the First Amendment in the prison setting. Clearly the rights of prison inmates, including their First Amendment rights, are subject to greater government control and intrusion than the rights of citizens in open society.

When it is all said and done, there is a wide variety of constitutionally protected actions, processes and rights that exist in open society that may not be permissible in the prison setting. The limitations on these rights are buffered by the expansive bundle of discretion that exists for prison administrators under *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Necessarily, that bundle of discretion creates some but certainly not unlimited administrative discretion. This is routinely described in cases involving prison authorities. It seems beyond dispute that these First Amendment rights must be evaluated and examined under the *Turner* context. It also speaks to the function of the United States judiciary, and particularly United States district courts, in becoming involved in the micromanagement of these kinds of issues in state prisons. It seems the best policy to defer to the expertise of prison administrators unless the constitutional right is clearly established in the prison context.

### II. Constitutionality of the Prison Rule

#### A. *Reasonably Related to Legitimate Penological Interests*

This case deals with an impingement on an inmate's constitutional rights, and the Court must therefore employ the standard outlined in the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). *See Russell v. Richards,* 384 F.3d 444, 447 (2004) (*Turner* applies to all circumstances where the

needs of prison administration implicate constitutional rights). According to *Turner*, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. 2254.

■ *Turner* identifies four factors to measure the reasonableness of a challenged regulation: (1) whether there is rational connection between the prison regulation and the legitimate governmental interest put forward to justify it and whether the governmental interest is neutral; (2) whether alternative means of exercising the right remain open to inmates; (3) the impact accommodating the asserted right will have on guards, other inmates, and prison resources generally; and (4) whether there is a reasonable alternative that accommodates the prisoner's rights at *de minimis* costs to valid penological interests. *Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254.

In applying this standard, this Court is required to give substantial deference to the prison administrators responsible for implementing and enforcing prison rules. *Thornburgh v. Abbott*, 490 U.S. 401, 407–08, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). The rights of prisoners "must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Id.* at 407, 109 S.Ct. 1874 (quoting *Turner*, 482 U.S. at 85, 107 S.Ct. 2254). In *Thornburgh*, the Supreme Court stated, "[a]cknowledging the expertise of these officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators." *Thornburgh*, 490 U.S. at 407–08, 109 S.Ct. 1874. Being mindful of the requirement for deference, the Court will evaluate the factors outlined in *Turner*.

### 1. Rational Connection Between Prison Regulation and Legitimate Interest

■ The primary factor for determining whether a regulation serves a legitimate penological interest is whether there is a valid, rational connection between the regulation and that legitimate interest. *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. "If the connection between the regulation is 'arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor." *Shaw v. Murphy*, 532 U.S. 223, 229–230, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) (quoting *Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254).

The government interest put forward to justify the rule at issue in this case is the security and safety of the prison facility. This interest is clearly a legitimate interest. As the Supreme Court has stated that maintaining the internal security of a prison is "central to all other corrections goals." *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). The real issue here is whether the connection between the rule prohibiting "blatant homosexual materials" and maintaining safety and security is valid and rational.

The defendant asserts that the regulation is necessary to "keep out of the prison anything that could lead one prisoner to think that another was homosexual." (Def. Mem. in Support of Motion for Summ. Judgment at 4; Buss Dep., p. 20). In support of this argument, he states that one who pays to receive homosexual magazines is more likely to be serious about homosexuality than others, and that receiving blatantly homosexual magazines will identify a person as homosexual. (Buss Dep., pp. 21, 23) This, in turn, will lead to safety and security problems. (*Id.* at 23). When an offender is thought to be homosexual he could be targeted for sexual and physical abuse and extortion. (*Id.* at 19, 21, 31). Additionally, because the

circulation of such materials cannot be controlled once they get into the facility, danger exists to anyone who possesses such materials even if they did not receive them directly through the mail.[1] (*Id.* at 30–31).

There can be little doubt that being identified as homosexual in prison marks an inmate as a target for violence or extortion. The Ninth Circuit expressly recognized this danger in *Harper v. Wallingford*, 877 F.2d 728, 730 (9th Cir.1989). The Court of Appeals there upheld a ban on mail from the North American Man/Boy Love Association (NAMBLA). The defendants demonstrated that the NAMBLA material threatened prison security because it could lead to violence against its readers and that "inmates who are identified as or suspected of being pedophiles or homosexuals are a favorite target for violence since many incarcerated felons were sexually abused as children." *Id.* at 730, 733. This is also consistent with the experience of Superintendent Buss through his personal knowledge, his investigations, and reports from his staff. (Buss Dep., pp. 31–32).

Moreover, as the Supreme Court has stated, it is not necessary to show that materials are "likely" to lead to violence, but rather it is sufficient to show that in the absence of the regulation a potential danger would exist. *Thornburgh*, 490 U.S. at 417, 109 S.Ct. 1874; *see also Harper*, 877 F.2d at 733; *Espinoza v. Wilson*, 814 F.2d 1093, 1097–1098 (6th Cir.1987) (prison met its burden by showing that materials created a potential danger to security even though no actual danger was demonstrated).

It is also clear that any prisoner in possession of these materials could be labeled as homosexual, whether or not he received them directly in the mail. The Supreme Court stated in *Thornburgh* that "prisoners may observe particular material in the possession of a fellow prisoner, draw inferences about their fellow's beliefs, *sexual orientation*, or gang affiliations from the material, and cause disorder by acting accordingly." *Thornburgh*, 490 U.S. at 412–413, 109 S.Ct. 1874 (emphasis added). The Court also noted in *Thornburgh* "that possession of homosexually explicit material may identify the possessor as homosexual and target him for assault." *Id.* at 413, 109 S.Ct. 1874. These statements are supported by Buss, who testified that any prisoner who possesses the banned material would be in danger. (Buss Dep., p. 31).

Additionally, it is equally clear that there is no reasonable way to control these materials once they enter the prison facility. Again, the Supreme Court has recognized this reality. The Court stated that "[t]he problem is not ... in the individual reading the material in most cases. The problem is in the material getting into the prison." *Thornburgh*, 490 U.S. at 412–413, 109 S.Ct. 1874. Once material makes its way into a prison, it "reasonably may be expected to circulate among prisoners."

---

1. The plaintiff asserts that this claim—that the goal of the policy is to protect the safety of all prisoners and not just the defendant—does not "make any sense." He states that "there is no prisoner at issue in this case except plaintiff. It is the application of the rule to him that is challenged in Plaintiff's First Amendment claim, not the rule in the abstract." (Pl. Mem. in Response at 4). The Court is wholly unpersuaded by this argument. The prisoners at WCF do not live in a vacuum. Prison officials may not promulgate and enforce rules as if those prisoners do live in a vacuum. The inquiry before this Court is whether the rule banning homosexual materials is reasonably related to the safety and security of the prison facility. Therefore, the analysis must look beyond the individual plaintiff here. The constitutionality of the rule as it applies to Willson is inextricably linked to the safety of prisoners in general. This approach is demanded by both logical application of the law and sound public policy.

*Id.* at 412, 109 S.Ct. 1874; *see Harper*, 877 F.2d at 733. Buss testified that there was no way to account for material once it entered the prison system, and that anyone who possessed the material would be at risk. (Buss Dep., pp. 30–31).

Finally, the Court notes that the government objective is "neutral" as that term was described in *Turner*. On its face, the regulation appears to be content based, but neutrality must be evaluated in light of *Turner* and its progeny. As the Supreme Court noted in *Thornburgh*, the Court's reference to "neutrality" in *Turner* meant that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Thornburgh*, 490 U.S. at 415, 109 S.Ct. 1874 (quoting *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)). Where "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which [the Supreme Court] meant and used that term in *Turner*." *Thornburgh*, 490 U.S. at 415–416, 109 S.Ct. 1874. As Buss testified, the rule was not designed to exclude every reference to homosexuality, but only those materials that would potentially label the prisoner as homosexual.[2] (Buss Dep., p. 23). The regulation here is therefore neutral under *Turner*.

The plaintiff relies heavily on *Espinoza v. Wilson*, 814 F.2d 1093 (6th Cir.1987) and *Whitmire v. Arizona*, 298 F.3d 1134 (9th Cir.2002). Those cases are distinguishable from this case, and neither is controlling here.

In *Espinoza*, the Sixth Circuit found that withholding certain homosexual publications was not reasonably related to prison safety and security because the prisoners had already been identified as homosexuals by the other inmates. *Espinoza*, 814 F.2d at 1098. The plaintiff argues that, because Willson was known by the inmates and prison staff to be homosexual, there is no rational relationship between the rule in question and prison safety. But the plaintiff ignores the potential danger to other inmates that could exist if the material is received by an openly homosexual individual and passed to other inmates. Those other inmates would be placed in danger whether or not they are actually homosexual. It is the possession of the material that could lead to the inference that the possessor is homosexual. *Thornburgh*, 490 U.S. at 412–413, 109 S.Ct. 1874. The identification of any inmate who happens to possess the material as homosexual is at the heart of the policy in this case. The sexual orientation of the prisoner who actually receives the material in the mail is immaterial, as is the knowledge of his sexual orientation by the other prisoners.

*Whitmire* is also distinguishable. It involved a ban on same-sex kissing or hugging during visitation. As stated above, the sexual orientation of the plaintiff is not controlling. There was no danger in *Whitmire*, as there is here, that the absence of the policy could cause prisoners who are not openly homosexual to be identified as homosexuals.

When viewed in light of the case law interpreting and applying *Turner*, the evidence in this case clearly establishes a

---

2. For instance, Buss stated that a reference to a homosexual act between men in Playboy magazine would not be considered "blatant homosexual material." (Buss Dep., p. 23). The decisions were made on the basis of whether the material might label the prisoner as a homosexual, and no one would reasonably infer that a man was homosexual simply because he possessed Playboy magazine.

valid, rational connection between the ban on "blatantly homosexual material" and the legitimate penological interest of maintaining safety and security. Once the material enters the prison, there is no way to prevent it from being circulated throughout the prison, and anyone who comes in possession of it is in danger of sexual violence, other physical violence and extortion. The rule and the goal of the rule as outlined by Buss, are not "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254.

### 2. Alternative Means of Exercising the Right

■ The second factor under the *Turner* analysis is whether alternative means of exercising the right on which the regulation impinges remain open to prison inmates. *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. As noted in *Harper*, the Supreme Court rejected the notion that prison officials must disprove the availability of alternatives in *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). *Harper*, 877 F.2d at 733. Here, as in *Harper*, although there were no alternative means of reading the magazines in question, "the plaintiff's access to material which does not violate the prison's security policy remains unaffected." *Id.*

### 3. The Impact Accommodation of the Asserted Right will have on Others

■ The third factor under the *Turner* analysis is the impact accommodating the asserted right will have on guards, other inmates, and prison resources. The *Turner* Court held that "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of correction officials." *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. The plaintiff argues that because the other inmates and prison staff were already aware that Mr. Willson

was homosexual, allowing him to receive these magazines would have no impact on other inmates or prison staff. Again, the plaintiff ignores the potential danger to other inmates who might come into possession of these magazines. Superintendent Buss made it abundantly clear that the policy was designed to protect all prisoners, including those who did not directly receive the material in the mail. (Buss Dep., p. 30–31). Accommodating Mr. Willson's request for these magazines would have had a substantial impact on other inmates and prison staff. Therefore, this factor weighs in favor of upholding the regulation.

### 4. Absence of Ready Alternatives that Fully Accommodate Prisoner's Rights

■ As to the final factor in the analysis, the *Turner* Court stated the following:

[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."

*Turner*, 482 U.S. at 90–91, 107 S.Ct. 2254 (citations omitted).

The only alternative suggested by the plaintiff is the use of WCF Rule II(B)(3), which prohibits displaying sexual items,

including those promoting homosexual activity, in inmate living areas. (Buss Dep., p. 8). As this rule is already in place and enforced, it could hardly be seen as an alternative to the rule at issue in this case. More importantly, that rule does nothing to prevent inmates from possessing materials that could cause them to be labeled as homosexual. The material need not be publicly displayed for inmates to be aware of another inmates possession of that material. As plaintiff has failed to show the existence of any valid alternative that would fully accommodate his rights at *de minimis* cost to penological interest, this factor favors upholding the regulation.

When viewed together, the factors under *Turner* demonstrate that the regulation was constitutional.

### B. *Void for Vagueness*

■ Willson argues that WCF Rule XII(D), banning prisoner's from receiving "blatant homosexual material," is void for vagueness because it lacks any objective standards and invites arbitrary and discriminatory enforcement. The Seventh Circuit has discussed the vagueness doctrine in the context of First Amendment cases arising in the prison setting:

> [T]he concepts of "overbreadth" and "vagueness" in the jurisprudence of the First Amendment were devised in order to prevent the slightest discouragement of free speech, and therefore have only limited relevance to a sphere where the right of free speech is limited. People who want to enjoy the full panoply of constitutional rights to express themselves had best refrain from committing crimes punishable by imprisonment.

*Ustrak v. Fairman,* 781 F.2d 573, 580 (7th Cir.1986), *cert. denied,* 479 U.S. 824, 107 S.Ct. 95, 93 L.Ed.2d 47 (1986). The Court of Appeals also noted:

> [T]he Supreme Court has held that the concepts of vagueness and overbreadth

have less scope when applied to the regulation of the free speech of soldiers than when applied in the civilian sphere, because of the special needs of military discipline. [Citations omitted.] The same is true with respect to communication within prisons.

*Id. Ustrak* upheld a rule forbidding inmates from "being disrespectful to any employee of the institution" and "swearing, cursing or us[ing] . . . any other vulgar, abusive, insolent, threatening, or improper language" or "indecency in language, action, or gesture at any time." *Id.* The Court of Appeals admitted that "the regulation is somewhat vague and overbroad, especially in the use of the words like 'disrespectful' and 'abusive'—and quixotic, too, in forbidding inmates to use 'improper language.'" *Id.*

In this case, the rule is clearer than the one involved in *Ustrak.* Furthermore, the plaintiff has not denied that the materials in question were clearly homosexual in nature or that the rule was arbitrarily applied to him when he was denied "Out" magazine and "The Advocate." Finally, this Court notes that "[i]n assessing the constitutionality of an allegedly vague state law or ordinance, 'a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered.'" *Gresham v. Peterson,* 225 F.3d 899, 907–908 (7th Cir. 2000). In this case, the defendant has defined "blatant homosexual" material as existing when "it's obvious, it's clear, by reading or looking at it, that it's homosexual material." (Buss Dep., p. 15). That construction is more than clear enough to withstand a void for vagueness challenge in a prison setting.

Because the regulation is constitutional under the *Turner* analysis, and is not void for vagueness, the Defendant is entitled to summary judgment.

### III. Qualified Immunity

 The defendant argues in his motion for summary judgment that, even if Willson's constitutional rights were violated, Buss is entitled to summary judgment because he is entitled to qualified immunity. Qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To be clearly established, the "contours of a right asserted must be sufficiently clear that a reasonable official would understand that what he or she is doing violates that right." *May v. Sheahan*, 226 F.3d 876, 881 (7th Cir.2000).

The Court of Appeals in *May* found that the prison administrator in that case was entitled to qualified immunity because the constitutionality of the prison rule in that case had not been answered in the Seventh Circuit. That is true of the rule in this case as well. A prisoner's right to receive homosexual magazines is not a right that is clearly established in this circuit. The plaintiff relies on the cases of *Espinoza*, 814 F.2d at 1098 and *Whitmire*, 298 F.3d 1134 as "closely analogous" cases that clearly establish the plaintiff's right in this case. Those cases are distinguishable from this case, as noted above, and are not controlling in this circuit. Moreover, those cases are at best directly contradicted by *Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989). Even if the rule in this case were unconstitutional, Buss would be protected by qualified immunity because the right at issue here is not clearly established.

### IV. Conclusion

When it is all said and done, the significant bundle of discretion and authority consigned to prison authorities under *Tur-*ner and its progeny constitute enough authority for the prison authorities to have taken the actions here absent clearly defined constitutional rights of prisoners to receive the kind of materials that are involved. Therefore, the plaintiff's motion for partial summary judgment is **DE-NIED**. The Defendant's motion for summary judgment is **GRANTED**. This is a final appealable order and the case is now considered closed. Each party will bear its own costs.

**IT IS SO ORDERED.**